UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | Case No. 23-10617-TBM |
| UPTOWN 240 LLC | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |

**DISCLOSURE STATEMENT TO ACCOMPANY
PLAN OF REORGANIZATION
DATED MAY 23, 2023**

**KUTNER BRINEN DICKEY RILEY, P.C.**
Keri L. Riley
1660 Lincoln St., Suite 1720
Denver, CO  80264
Telephone:  303-832-2400
Email:  klr@kutnerlaw.com

Counsel to the Debtor
and Debtor in Possession

1

THE VOTING DEADLINE IS 5:00 P.M. PREVAILING MOUNTAIN TIME ON [          ], 2023 (UNLESS THE DEBTOR EXTENDS THE VOTING DEADLINE)

TO BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN, THE DEBTOR MUST ACTUALLY RECEIVE YOUR BALLOT ON OR BEFORE THE VOTING DEADLINE.

**IMPORTANT INFORMATION FOR YOU TO READ**

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE DEBTOR'S PLAN OF REORGANIZATION IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

THE DEBTOR IS PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR ITS PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE TO HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. THIS DISCLOSURE STATEMENT CONTAINS "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. ANY SECURITIES DESCRIBED HEREIN WILL BE ISSUED TO CREDITORS WITHOUT REGISTRATION UNDER THE UNITED STATES

SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, AND WILL INSTEAD RELY UPON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE TO THE MAXIMUM EXTENT PERMITTED AND APPLICABLE. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SECURITIES PURSUANT TO THE PLAN CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE TRANSFERABILITY OF ANY SUCH SECURITIES.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE DEBTOR URGES EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

IT IS THE DEBTOR'S POSITION THAT THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER. RATHER, HOLDERS OF CLAIMS AND EQUITY INTERESTS AND OTHER ENTITIES SHOULD CONSTRUE THIS DISCLOSURE STATEMENT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT. THE DEBTOR MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTOR'S CHAPTER 11 CASE AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE. ALTHOUGH THE DEBTOR BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN

BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR'S MANAGEMENT. THE DEBTOR DOES NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTOR'S MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTOR HAS USED ITS REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED.

THE DEBTOR IS GENERALLY MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF WHERE FEASIBLE, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTOR MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTOR HAS NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DISCLOSURE STATEMENT WAS FILED. THE DEBTOR HAS NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTOR AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. IMPORTANTLY, PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN SECTION X HEREIN, "RISK TO CREDITORS."

## I.     INTRODUCTION AND OVERVIEW

Uptown 240, LLC, a Colorado limited liability company, filed its voluntary petition pursuant to Chapter 11 of Title 11 of the United States Bankruptcy Court for the District of Colorado ("Bankruptcy Court") on February 23, 2023 ("Petition Date").

The Debtor is submitting this Disclosure Statement in accordance with 11 U.S.C. § 1125 to provide information regarding the Debtor's Plan of Reorganization (as may be further amended, supplemented, or modified from time to time, the "Plan") dated May 23, 2023. A copy of the Plan and ballot for acceptance or rejection of the Plan accompanies this Disclosure Statement and incorporated herein by reference. All capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meanings given to them in Article I, Section B of the Plan. The rules of interpretation set forth in Article I, Section A govern the interpretation of this Disclosure Statement.

**Voting Requirements.** Pursuant to the Bankruptcy Code, only Classes of Claims or Interests that are Impaired and that will (or may) receive or retain property or any interest in property under the Plan are entitled to vote to accept or reject the Plan. Classes of Claims and Interests that are not Impaired are not entitled to vote and will be deemed to accept the Plan. Classes of Claims and Interests that will not receive or retain any interest in property under the Plan are not entitled to vote and will be deemed to reject the Plan. Voting on the Plan shall be in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules, and a voting Class shall have accepted the Plan if the Plan is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Allowed Claims of such Class actually voting, without including the vote of any insider. Each holder of an Allowed Claim in Classes 1 through 8 shall be entitled to vote to accept or reject the Plan. If a holder of a Claim holds more than one Claim in any one Class basis, all Claims of such holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims voting for or against the Plan.

**Recommendation.** The Debtor believes that the Plan is fair and equitable, maximizes the value of the Debtor's estate, and provides the greatest likelihood for recovery to claimholders, including unsecured creditors. Accordingly, the Debtor believes that approval of the Plan is in the best interests of its estates and its creditors, and urge acceptance and approval of the Plan by all creditors and interest holders.

## II.     CHAPTER 11 AND PLAN CONFIRMATION

Chapter 11 of the United States Bankruptcy Code is designed to allow for the rehabilitation and reorganization of financially troubled entities or individuals. Chapter 11 allows the debtors to retain its assets during the administration of its Chapter 11 case as a debtor-in-possession. Following confirmation of the Plan, Chapter 11 allows the debtors to retain their assets as a reorganized debtor or as otherwise provided in the Plan. If the Plan is approved by the Court, the Plan is the permanent restructuring of the debtors' financial obligations. The Plan also provides a means through which the debtors will restructure or repay their obligations. The Plan will provide the debtors with an opportunity to maximize the return for creditors through continued operations.

The Plan divides creditors into classes of similarly situated creditors.  All creditors of the same Class are treated in a similar fashion.  All Interests are also classified and treated alike.  Each Class of creditors or interest holders is either impaired or unimpaired under the Plan.  A Class is unimpaired if the Plan leaves unaltered the legal, equitable and contractual rights to which each creditor in the Class is entitled or if the Plan provides for the cure of a default and reinstatement of the maturity date of the claim as it existed prior to default.

The Debtor filed a Motion to Set Bar Date for Filing Claims and Requests for Allowance of Administrative Expense Claims Under Bankruptcy Code § 503(b)(9) ("Bar Date Motion").  On March 28, 2023, the Court entered an Order establishing May 12, 2023 as the as the last day:  a) for filing of any Proof of Claim for a pre-petition claim or interest; and b) by which motions or requests for allowance of administrative expense claims pursuant to 11 U.S.C. §503(b)(9) must be filed ("Bar Date").  The Plan provides that Claims and Interests of all Classes shall be Allowed only if such Claims are either: a) evidenced by a timely filed Proof of Claim or Interest; or b) appear in the Schedules filed by the Debtors and are not scheduled as disputed, contingent or unliquidated, unless subsequently Allowed by the Court.  Creditors may check as to whether or not their Claims are scheduled as disputed, contingent or unliquidated by reviewing the Schedules and the amendments thereto filed by the Debtors in the Bankruptcy Court for the District of Colorado, or by viewing the claims register  by the Bankruptcy Court.  Alternatively, creditors may contact counsel for the Debtors or the Debtors directly in order to determine how their claim was scheduled.

Chapter 11 does not require that each holder of a Claim or Interest vote in favor of the Plan in order for the Court to confirm the Plan.  The Plan, however, must be accepted by at least one impaired Class of Claims by a majority in number and two-thirds in amount, without including insider acceptance of those Claims of such Class actually voting on the Plan.  Assuming one impaired Class votes to accept the Plan, it may be confirmed over its rejection by other Classes if the Court finds that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Claims or Interests that is impaired under and has not accepted the Plan.  The Bankruptcy Code requires that if interest holders retain an interest or receive anything under the Plan, then the unsecured creditor classes must either be paid the full value of their claims or vote to accept the Plan.  The Debtor is proposing to either refinance the secured debt and continue with development of the project or, in the alternative, to sell the Property.  Since the Debtor believes that the Plan provides the best alternative for creditors, all creditors are urged to vote to accept the Plan.

If all Classes of Claims and Interests vote to accept the Plan, the Court may confirm the Plan.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation.  Among other things, Section 1129 requires that the Plan be in the best interest of the holders of Claims and Interests and be feasible through a showing that confirmation will not be followed by the need for further financial reorganization of the Debtors.

### III.   OVERVIEW OF THE PLAN AND MEANS OF EXECUTION

The Plan divides creditors and interest holders into the following nine Classes.  Treatment of each of the Classes is discussed in greater detail below and in the Plan.  The following table summarizes the Classes as to each Debtor, whether or not each such Class is impaired, and, to the extent determinable, the treatment of each Class:

| CLASS | IMPAIRMENT | TREATMENT |
|---|---|---|
| 1 – Allowed Secured Claim of JGJP Dillon, LLC | Impaired | Proposed Secured Claim Payment of $7,191,247.28 paid from Proceeds as settlement of claims and pre-petition litigation; to the extent not agreed to, treated as otherwise provided in the Plan |
| 2a - Allowed Secured Claim Symmetry Builders, Inc. | Impaired | Proposed Secured Claim Payment of $7,191,247.28 paid from Proceeds as settlement of claims and pre-petition litigation; to the extent not agreed to, treated as otherwise provided in the Plan |
| 2b - ClayDean Electric Company | Impaired | Proposed Secured Claim Payment of $7,191,247.28 paid from Proceeds as settlement of claims and pre-petition litigation; to the extent not agreed to, treated as otherwise provided in the Plan |
| 2c – RMS Concrete, Inc. | Impaired | Proposed Secured Claim Payment of $7,191,247.28 paid from Proceeds as settlement of claims and pre-petition litigation; to the extent not agreed to, treated as otherwise provided in the Plan |
| 2d – Barton Materials, LLC | Impaired | Proposed Secured Claim Payment of $7,191,247.28 paid from Proceeds as settlement of claims and pre-petition litigation; to the extent not agreed to, treated as otherwise provided in the Plan |
| 3 – Allowed Secured Claim of the Town of Dillon | Impaired | Proposed Secured Claim Payment of $7,191,247.28 paid from Proceeds as settlement of claims and pre-petition litigation; to the extent not agreed to, treated as otherwise provided in the Plan |
| 4 – Allowed Secured Claim of ProNet Capital, LLC | Impaired | Proposed Secured Claim Payment of $7,191,247.28 paid from Proceeds as settlement of claims and pre-petition litigation; to the extent not agreed to, treated as otherwise provided in the Plan |
| 5 – Allowed Secured Claim of John and Melissa Hourigan | Impaired | Proposed Secured Claim Payment of $7,191,247.28 paid from Proceeds as settlement of claims and pre-petition |

| | | litigation; to the extent not agreed to, treated as otherwise provided in the Plan |
|---|---|---|
| 6 – Allowed Secured Claim of Craig Slawson | Impaired | Proposed Secured Claim Payment of $7,191,247.28 paid from Proceeds as settlement of claims and pre-petition litigation; to the extent not agreed to, treated as otherwise provided in the Plan |
| 7 – Allowed Claims of Buyers | Impaired | Assuming the Debtor is proceeding with a partial refinance, provided with the option to have Sale Contract assumed (maintained) or rejected (terminated); claims for rejected contracts treated as Class 8 General Unsecured Claims; All Contracts rejected in the event of sale and treated as Class 8 General Unsecured Claims |
| 8 – Allowed Unsecured Claims of General Unsecured Claims | Impaired | Pro rata distribution of 50% of net revenue from the final sale of condominium units starting on the earlier of: 1) eighteen months from the Effective Date of the Plan, or 2) final sale of the first condo unit.<br><br>If the Debtor proceeds under a sale, pro rata distribution of the sale proceeds after payment of secured claims and administrative expense claims. |
| 9 – Interests in Uptown 240, LLC | Unimpaired | Retained by the Petition Date Interest Holders |

## IV.   BACKGROUND AND EVENTS LEADING TO CHAPTER 11 FILING

### A.   _Overview of Operations for Uptown 240, LLC_

Uptown was formed in 2017 by IGADC Family Corporation ("IGADC") and Danilo and Chantelle Ottoborgo.[1]  Prior to the formation of Uptown, the Ottoborgo family owned the real property and operated a restaurant on the location.  Starting as early as 2012, the Ottoborgos began

---

[1] Mr. and Ms. Ottoborgo are shareholders in IGADC and officers of the Debtor.  They do not hold a direct ownership interest in the Debtor.

the process of redeveloping the property, and when Uptown was formed in 2017, IDGAC contributed the real property to Uptown for the redevelopment of the Property.

After approval of site plans, Uptown broke ground on the construction of the current construction project in 2018. Through early 2020, Uptown worked to develop the project, at had completed all of the underlying infrastructure and a majority of the horizontal construction before construction halted in early 2020, including completion of all infrastructure, a majority of the parking garage, and the concrete foundation work. The Debtor estimates that the project is approximately 35% complete.

### B. *Events Leading to Bankruptcy Filing*

In 2020, the Debtor's primary lender who was providing construction financing changed their internal lending terms without prior notice to the Debtor and as a result, refused to provide further construction financing to Uptown. Uptown worked to find a replacement financier for the project and in April 2020 was in the process of closing on a new loan when the prospective lender backed out of the loan as primary investment fund from which the lender would be drawing funds for the Debtor's loan was comprised primarily of oil and gas assets, and the significant drop in the price of oil let to shortages in the investment fund.

The Debtor continued to try to find a replacement financier throughout 2021 and 2022, working with the primary lender on extensions of the maturity date of the existing note. However, in September of 2022, JGJP Dillon, LLC acquired the note and deed of trust on the Property and quickly commenced a foreclosure action, further impeding the Debtor's refinancing efforts. With a foreclosure set for late February, the Debtor was faced with the prospect of a foreclosure on the Property that would result in a loss of all equity in the Property, and as a result, filed its voluntary petition pursuant to Chapter 11 of the Bankruptcy Code on February 23, 2023 to stay the foreclosure and preserve the equity in the Property while it completed a refinance.

In 2020, a mechanics lien holder asserting an interest against the property commenced an action to proceed with a foreclosure on the Property, resulting in further litigation over the nature, extent, validity, and priority of liens against the Property. The litigation was stayed continuously by agreement of the parties, and all parties had only just filed their respective answers when the Debtor's bankruptcy case was filed. The litigation was stayed as a result of the Debtor's bankruptcy filing.

### V.    SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASES

The Debtor has complied with all requirements of the Bankruptcy Code and of the Office of the U.S. Trustee, including attending the Initial Debtor Interview and its Meeting of Creditors, and complied with all Orders entered by the Bankruptcy Court. The following items have also been addressed during the course of the Chapter 11 case:

### Appointment of Official Committee of Unsecured Creditors.

On April 21, 2023, the United States Trustee appointed an Official Unsecured Creditors' Committee ("Committee"). In accordance with the United States Trustee's Appointment of

Official Committee of Unsecured Creditors, the Committee is comprised of Aaron Bartels, Joel Cochran, Richard LaPierre, Matthew Follett, Angela Ward, Harry Salzman, and David Holt.

**Motion for Relief From Stay.**  On April 7, 2023, the primary secured creditor, JGJP Dillon, LLC ("JGJP") filed its Amended Motion for Relief from Stay, asserting that the Property is over encumbered and there is no equity in the Property and that the case was filed in bad faith, therefore seeking to proceed with the pre-petition foreclosure.  The primary argument in JGJP's motion is that the Property is only work $11.4 million, and thus with the mechanics liens on the Property, there is no remaining equity.

On April 25, 2023, the Debtor timely filed its Objection to the Motion for Relief from Stay, asserting that there is significant equity in the Property, that the Debtor has a reasonable likelihood of confirming a plan of reorganization, and that the case was filed in good faith.  Consistent with the Debtor's Schedule A/B, the Debtor believes that the value of the Property is approximately $27 million, as was determined by an MAI appraiser in 2021 in connection with the Debtor's pre-petition refinancing efforts.  Joinder's to the Debtor's Objection to the Motion for Relief from Stay were filed by the Committee, MNJ Consulting by Design, Inc., Callcomm Mining Corp., and Note Acquisitions.

At a preliminary hearing on the Motion for Relief from Stay on May 2, 2023, the Court determined that there were contested factual issues that required a final evidentiary hearing.  A final hearing on the Motion for Relief from Stay is set for June 20 and 21, 2023.

### Restructuring and Reorganization Efforts

Since the filing of the bankruptcy case, the Debtor has undertaken significant effort to move forward with its restructuring efforts.  Pre-petition, the Debtor was working with Fairchild Opportunity Fund, LLC ("Fairchild") to close on a bridge loan and a construction loan, closing on which was unexpectedly delayed.  Post-petition, the Debtor met with several other parties regarding exit financing, but ultimately elected to move forward with Fairchild.  On May 19, 2023, Fairchild issued a Commitment Letter to the Debtor for the Bridge Loan and a Conditional Commitment Letter for the Construction Loan.  More information regarding the Bridge Loan and Construction Loan are included herein.

## VI.   DESCRIPTION OF ASSETS

The value of the Debtor's assets, owned on the petition date, are set forth in the following chart.  All values are as of the Petition Date unless otherwise specified.  Additional information about the Debtor's assets can be found in its schedules.

| Asset | Value |
|---|---|
| Checking Account | $111,136.50 |
| Accounts Receivable (Amounts due on Sale Contracts) | $19,099,213.00 |
| Sale Contracts | Unknown |
| Real Estate Development Project located at 240 Lake Dillon Drive, Dillon, CO | $27,000,000 |
| Litigation Claims | Unknown |
| **Total** | **$46,210,349.50** |

**The asset values set forth above represent a gross value for each asset, not a value net of liens.** The values for all assets represent the values on the Petition Date as listed in the Debtor's Schedules. The Debtor's primary asset is the Property. Upon completion, the Property is intended to be a mixed use facility with 80 condominium units and commercial space. The value of the Property set forth above is based on a 2021 appraisal. The Debtor believes that the Property has maintained its value and may have increased in value. In connection with the hearing on the Motion for Relief from Stay, the Debtor is in the process of obtaining a new appraisal to determine the current, as is value of the Property.

The Debtor has also listed the remaining amounts due on the Sale Contracts with buyers as a receivable. Pre-petition, the Debtor entered into Sale Contracts for the sale of approximately 39 of the units. The balance due on the respective contract becomes due after a Certificate of Occupancy is issued. As set forth more fully herein, buyers under the Plan may elect to have their contract assumed or rejected. If the contracts are rejected, the amount of the receivables will decrease but the available inventory of units to be sold at current market rates will increase. Similarly, if the Debtor proceeds with a sale, then the Sale Contracts would be deemed rejected, and there would be no further receivables.

The Debtor has also listed certain litigation claims on its schedules related to its prior financing and subsequent refinancing efforts. The Debtor has not done an in depth investigation into the claims but reserves the right to pursue claims if it determines that they have merit and value to the estate.

## Avoidance Actions

The Debtor reserves the right to bring avoidance actions pursuant to 11 U.S.C. §§ 545 through 550 and state and bankruptcy law fraudulent conveyance actions. At present, the Debtor reserves the right to bring preference or fraudulent conveyance actions, including actions related to payments made to creditors within the 90 days prior to the Petition Date. The Debtor does not currently believe that any Avoidance Actions exist, as the only payments made in the 90 days prior to filing were payments to the Debtor's former accountant. The Debtor reserves the right to bring any Avoidance Action that it determines have a valid legal basis and value to creditors and the estate.

## VII.   DESCRIPTION OF LIABILITIES

### A.   Priority Claims

Priority Claims are defined in the Plan as any pre-petition Claim entitled to a priority in payment under § 507(a) of the Code, excluding any Administrative Claim or Tax Claim.  Section 507(a) of the Code includes but is not limited to claims for: wages, salaries, or commissions, including vacation, sick leave, or severance pay owing to employees; and sales commissions earned by an individual within 180 days prior to filing the petition. 11 U.S.C. § 507(a)(1)-(4) (2019).

### 1.   Administrative Expense Claims

**Professional Fees.**  Administrative Claims are those Claims for payments of administrative expenses of the kind specified in § 503(b) or § 1114(e)(2) of the Bankruptcy Code and are entitled to priority pursuant to § 507(a)(2) of the Bankruptcy Code, including but not limited to: the actual, necessary costs and expenses of preserving the estate; payment of professional fees; fees payable to the trustee; and all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a final order of the Bankruptcy Court.  Professional fee claims have been reduced in part through payments made by the Debtor through both retainers and through interim payments allowed under the terms of the Cash Collateral Order and the interim payment of professional fee order entered during the case.  The Administrative Claims include the Professional Fees incurred during the case which remain unpaid, including fees and costs for:

| Claimant | Service | Fees and Costs incurred and paid through May 2023 (estimate) |
|---|---|---|
| Kutner Brinen Dickey Riley, P.C. | Bankruptcy Counsel | Fees:$20,000 (approximate) Costs: $200 (approximate) Paid: $0 |
| Onsager Fletcher Johnson Palmer, LLC | Counsel for the Official Committee of Unsecured Creditors | Fees: Unknown Costs: Unknown Paid: $0 |
| Eide Bailly, LLP | Accountant for the Debtor | Fees: Unknown Costs: Unknown Paid: $0 |
| Chrysalis Valuation Consultants, LLC | Appraiser for the Debtor | Fees: Unknown Costs: Unknown Paid: $0 |

### 2.   Tax Claims

Priority Tax Claims are defined in the Plan as any Claim that is entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code and shall include interest solely to the extent that the holder of such Claim is entitled to such interest under section 507(a)(8)

of the Bankruptcy Code. The Internal Revenue Service ("IRS") filed Proof of Claim No. 12-1 asserting a claim in the amount of $500 based on an estimate based on unfiled returns. The Debtor intends to work with the IRS to address the claim, as the Debtor has filed all but the most recent return. To the extent necessary, the Debtor will object to the IRS claim if it is unable to resolve issues related to the claim. The Debtor does not believe that there are any priority tax claims at this time.

### 3.       U.S. Trustee Fees

All unpaid U.S. Trustee Fees shall be paid on a current and ongoing basis until the case is closed.

### B.    Secured Claims.

A summary of the known Secured Claims for the Debtor's bankruptcy estate is set forth below.

### 1.       JGJP Dillon, LLC (Class 1)

Class 1 is comprised of the secured claim of JGJP Dillon, LLC ("JGJP"). In March 2019, the Debtor entered into a loan with BRELF II, LLC, pursuant to which the Debtor granted a Deed of Trust on the Property. On or about September 14, 2022, JGJP acquired the Note and Deed of Trust from BRMK Lending, LLC ("BRMK"), successor by merger to BRELF II, LLC. At the time of acquiring the debt from BRMK, the amount of the debt was approximately $7 million. On May 11, 2023, JGJP filed Proof of Claim No. 33 asserting a secured claim as of the Petition Date, approximately six (6) months after acquiring the Note, in the amount of $9,180,870.95. The Debtor disputed the amount of the claim asserted by JGJP.

### 2.       Mechanics Lien Parties (Class 2a through 2d)

Classes 2a through 2d are comprised of the secured claims of creditors asserting a claim from work performed on or materials delivered to the Property for which such creditor has properly asserted a mechanics lien and perfected its rights pursuant to C.R.S. §§ 38-22-101, et seq. which are set forth below:

| Creditor | Class | Claim Amount in Proof of Claim |
|---|---|---|
| Symmetry Builders, Inc. | 2a | $6,046,919.99 (Claim No. 38 and 39) |
| ClayDean Electric Company | 2b | $575,154.00 (Claim No. 35) |
| RMS Concrete, Inc. | 2c | $1,187,771.80 (Claim No. 3) |
| Barton Materials, LLC d/b/a Barton Supply | 2d | $208,525.00 (Claim No. 29) |

Pre-petition Symmetry Builders, Inc. ("Symmetry") was engaged by the Debtor as a general contractor to perform services on the Property. Symmetry engaged additional subcontractors who also provided services and materials on the Property, some of whom have also filed mechanics liens against the Property, including ClayDean Electric Company ("ClayDean"), RMS Concrete, Inc. ("RMS"), and Barton Materials, LLC ("Barton"). Symmetry filed Proof of Claim Nos. 38 and 39 asserting a secured claim in the amount of $6,046,919.99. The Claim filed

by Symmetry includes the amounts owed to RMS, which in turn includes the amounts owed to Barton, and ClayDean.

ClayDean filed Proof of Claim No. 35 asserting a claim in the amount of $575,154.00. The amount of the ClayDean Claim includes the full amount of their contract, as opposed to just the work performed. The actual amount owed for the work performed is $49,554, and is included in the Symmetry Claim. To the extent not resolved through the Plan, the Debtor intends to object to the ClayDean Claim based on the amount of the claim and to avoid the duplication of claims.

RMS filed Proof of Claim No. 3 asserting a claim in the amount of $1,187,771.80. The amount of the RMS Claim includes the amounts due to Barton and is included in the Symmetry Claim. To the extent not resolved through the Plan, the Debtor intends to object to the RMS Claim to avoid the duplication of claims.

Barton filed Proof of Claim No. 29 asserting a claim in the amount of $208,525.00. The Barton Claim is included in the RMS Claim, which is, in turn, included in the Symmetry Claim. To the extent not resolved through the Plan, the Debtor intends to object to the Barton Claim to avoid the duplication of claims.

3.      **Town of Dillon (Class 3)**

The Class 3 Claim is comprised of the secured claim of the Town of Dillon based on a statutory lien for unpaid utilities and certain other assessed fees, including a sidewalk expense. The Town of Dillon filed Proof of Claim No. 21 asserting a secured claim in the amount of $123,374.30. The Debtor is still investigating the amount of the claim.

4.      **ProNet Capital, LLC (Class 4)**

The Class 4 Claim is comprised of the secured claim of the ProNet Capital, LLC based on a pre-petition judgment entered in the District Court for Denver County, Colorado and a transcript of judgment recorded with the Summit County Clerk and Recorder on April 21, 2022. ProNet filed Proof of Claim No. 5 asserting a secured claim in the amount of $130,160.84.

5.      **John and Melissa Hourigan (Class 5)**

The Class 5 Claim is comprised of the secured claim of John and Melissa Hourigan based on a pre-petition judgment entered in the District Court for Summit County, Colorado and a transcript of judgment recorded with the Summit County Clerk and Recorder on February 9, 2023. Mr. and Mrs. Hourigan filed Proof of Claim No. 2 asserting a secured claim in the amount of $164,267.51.

6.      **Craig Slawson (Class 6)**

The Class 6 Claim is comprised of the secured claim of Craig Slawson based on a Promissory Note in the original principal balance of $400,000 and a second Promissory Note in the original principal balance of $200,000 and secured by a Deed of Trust against the Property.

Mr. Slawson filed Proof of Claim No. 15 asserting a secured claim in the amount of $1,174,849.19. To the extent not resolved by the Plan, the Debtor intends to object to the Claim, in part because some of the default interest assessed on the Claim appears to exceed the Colorado Usery Rate.

### C.   Non-Priority Unsecured Creditors.

#### *Buyers (Class 7)*

Class 7 is comprised of the claim or potential claims of parties who entered into Sale Contracts with the Debtor.  Each of the Sale Contracts represents an executory contract to which the Debtor is a party, and under which performance is due on each side, as the Debtor must still complete the units and the Buyers must still pay the remaining amounts due under their respective Sale Contracts.  Buyers are separately classified for the purpose of providing such parties with clear information regarding their rights and treatment under the Plan.

#### *General Unsecured Creditors (Class 8)*

Class 8 is generally comprised of the unsecured claims against the Debtor's estate.  As set forth on Exhibit A, the total unsecured claims against the estate are approximately $10,452,244.28, which amount includes the claims of certain Buyers who have filed a Proof of Claim as well as disputed Claims.  Assuming the Debtor prevails on two claim objections it has already identified, the Debtor anticipates the Class 8 Claims will be reduced to $4,889,924.28.  The actual amount of Class 8 Claims will depend on: 1) whether the Debtor is proceeding under Scenario 1 or 2; and 2) if the Debtor is proceeding under Scenario 1, what Buyers elect to have their contracts assumed. If all of the Buyers elect to have their contracts assumed, the amount of Class 8 Claims is anticipated to be $558,027.57.  If all Buyers elect to have their contracts rejected, the amount of Class 8 Claims is anticipated to be approximately $6.6 million.

### D.   Equity Interests In the Debtor

On the Effective Date of the Plan, the Equity Interests in the Debtor were owned by IGADC Family Corporation, that holds 80% of the Debtor's equity interests, and MNJ Consulting by Design, Inc., that holds 20% of the Debtor's equity interests.  Danilo and Chantelle Ottoborgo, the President and Executive Vice President of the Debtor respectively, do not have an equity interest in the Debtor directly, but do hold an interest in IGADC.

### E.   Leases and Executory Contracts.

On the Effective Date of the Plan, the Debtor was a party to a number of executory contracts or unexpired leases.  The primary executory contracts of the Debtor are the Sale Contracts by and between the Debtor and Buyers for the purchase of unit upon completion.  Pre-petition, the Debtor sold approximately 41 units, and on the Petition Date, approximately 39 Sale Contracts remained open.

In addition to the Sale Contracts, the Debtor also had a land lease with Group 4Gs for a portion of the neighboring land that was previously used as a construction staging area.  The Debtor also had contracts with Melbourne Studios for web design and marketing services and Studio PBA for architect services.  Pre-petition the Debtor also had a general contractor agreement with Symmetry Builders, Inc., and is working to determine if the contract was still in effect on the

Petition Date.

# VIII.   DESCRIPTION OF PLAN

## A.   General Description

The Debtor filed its Plan of Reorganization with the United States Bankruptcy Court for the District of Colorado on May 24, 2023. The Plan provides for the reorganization of the Debtor under Chapter 11 of the Bankruptcy Code. Pursuant to the Plan, the Debtor shall either restructure its debt and obligations with a partial refinance, or shall sell the Property and make distributions to creditors from sale proceeds. The Plan provides for the specification and treatment of all creditors and Interest holders of the Debtors. The Plan identifies whether each Class is impaired or unimpaired. A Class is unimpaired only if the Plan leaves unaltered the legal, equitable, or contractual obligations between the Debtor and the unimpaired claimants or Interest holders. The following is a brief summary of the Plan. The actual text of the Plan should be reviewed for more specific detail.

As provided in Section 1123(a)(1) of the Bankruptcy Code, the Priority Administrative and Tax Claims against the Debtor are not designated as classes. The holders of such Allowed Claims will be paid in full and are not entitled to vote on the Plan. The Plan divides the creditors into separate classes. The classes are set forth as follows:

Class 1 - The Allowed Secured Claim of JGJP Dillon, LLC

Class 2a-2d - The Allowed Secured Claims held by the Mechanics Lien Parties

    Class 2a – The Allowed Secured Claim of Symmetry Builders, Inc.

    Class 2b - The Allowed Secured Claim of ClayDean Electric Company

    Class 2c – The Allowed Secured Claim of RMS Concrete, Inc.

    Class 2d – The Allowed Secured Claim of Barton Materials, LLC

Class 3 – The Allowed Secured Claim of the Town of Dillon

Class 4 – The Allowed Secured Claim of ProNet Capital, LLC

Class 5 – The Allowed Secured Claim of John and Melissa Hourigan

Class 6 – The Allowed Secured Claim of Craig Slawson

Class 7 – The Allowed Claims of Buyers

Class 8 – The Allowed General Unsecured Claims held by unsecured creditors unless separately classified.

Class 9 – The Interests in Uptown 240, LLC

**B.      The Claims**

**1.      Unclassified Priority Claims**

The holders of Allowed Claims of the type specified in Section 507(a)(2) of the Bankruptcy Code, including the costs and expenses of administration, shall receive cash equal to the Allowed amount of such Claim or a lesser amount or different treatment as may be acceptable and agreed to by the particular holders of such Claims.  Such Claims shall be paid in full on the Effective Date, or treated as otherwise agreed by the particular holders of such Claims.  Administrative Claims that are Allowed by the Court after the Effective Date of the Plan shall be paid upon allowance or as otherwise agreed by the particular holders of such Claims.  At the current time the Debtor has no agreements with administrative claimants to be paid other than in full as of the effective date of the Plan.

All Administrative Claims of professionals are subject to Court approval on notice to creditors with an opportunity for a hearing.  Certain Professional Fees may be paid pursuant to interim fee applications and upon Court allowance.  The following fees and costs have been incurred by professionals in this case:

| Claimant | Service | Fees and Costs Through Plan Confirmation |
|---|---|---|
| Kutner Brinen Dickey Riley, P.C. | Bankruptcy Counsel | Fees:$50,000 (estimate; assumes significant litigation over the Motion for Relief from Stay and Plan Confirmation, and does not incorporate the application of the pre-petition retainer paid to counsel) Costs: $1,500 |
| Onsager Fletcher Johnson Palmer, LLC | Counsel for the Official Committee of Unsecured Creditors | Fees: $Unknown Costs: $Unknown |
| Accountant | Accountant for the Debtor | $10,000 (estimate) |
| Appraiser | Appraiser for the Debtor | $15,000 (estimate) |

Any amounts set forth above are estimates of the fees that will be due upon Confirmation or allowance.  The actual amount of fees and costs will be subject to approval by the Bankruptcy Court  The Debtor anticipates that it will have sufficient funds available to satisfy these claims on the Effective Date or upon allowance of such fees and costs.

2.    **Tax Claims**

Tax Claims are any Claim of a governmental unit for taxes entitled to priority pursuant to 11 U.S.C. § 507(a)(8).  The Tax Claims will be paid in full on the Effective Date of the Plan.  The Debtor does not anticipate that any Tax Claims will be due on the Petition Date.

3.    **Secured Claims (Classes 1 through 6)**

The Class 1, Class 2a through 2d, Class 3, Class 4, and Class 5 Claims (collectively the "Secured Claims") constitute the secured claims against the Property, secured by either a deed of trust, mechanics lien, statutory lien, or judgment lien as set forth above.  Pre-petition, litigation was commenced by the holders of certain mechanics liens to determine the extent validity, and priority of the respective liens against the Property.  The Secured Claims are impaired by the Plan.

Subject to the proposed Secured Claim Payment, the Secured Claims shall be allowed (i) in the principal amount owed on the Effective Date of the Plan or (ii) if the Holders of Secured Claims object, in an amount to be determined by the Court on or before the Confirmation Date; or (iii) an amount agreed upon by the Debtor and the respective Holder of a Secured Claim on or before the Confirmation Date.  All Secured Claims shall retain their liens until the earlier of the Debtor's closing on a Bridge Loan or sale of the Property.  Upon the occurrence of either event, the liens shall transfer to the Proceeds of the Bridge Loan or sale.

The Debtor has proposed to settle the pre-petition litigation and any claim objections the Debtor could otherwise bring through payment from the Proceeds in the following amounts in satisfaction in full of the amount of their secured claim ("Secured Claim Payment"):

| Class | Creditor | Payment Amount |
|-------|----------|----------------|
| 1 | JGJP Dillon, LLC | $7,191,247.28 |
| 2a | Symmetry Builders, Inc. | $4,528,792.71 |
| 2b | ClayDean Electric Company | $49,554 |
| 2c | RMS Concrete, Inc. | $622,946.50 |
| 2d | Barton Materials, LLC | $208,525.80 |
| 3 | Town of Dillon | $71,000.00 |
| 4 | ProNet Capital, LLC | $125,000 |
| 5 | John and Melissa Hourigan | $155,000 |
| 6 | Craig Slawson | $850,000 |

| | Total | $13,802,066.29 |
|---|---|---|

If the Secured Creditor accepts their respective Secured Claim Payment, the acceptance will constitute a release by the Debtor of any objection to such creditor's Claim and a release of any claims or defenses related thereto.  It will also act as a release by the Secured Creditor accepting their respective payment of any further lien rights such Creditor may assert as to the Property or the Proceeds.  Acceptance of the Secured Creditor Payment does not impair a Secured Creditors right to assert an unsecured claim to the extent applicable.

If a Secured Creditor objects to their Secured Claim Payment, Proceeds will be held in escrow pending a determination by the Court of the amount of Proceeds to which such creditor is entitled.  If the amount to which the creditor is entitled exceeds the amount of Proceeds remaining, the Secured Creditor shall have a lien on the Debtor's Receivables if the Debtor proceeds under Scenario 1, or shall have a Class 8 general unsecured claim if the Debtor proceeds under Scenario 2.  Any liens on Receivables shall bear interest at a rate of 7% per annum and shall be paid upon final sale of a unit and/or receipt of receivables.

Payment of the Secured Claims shall be made within five (5) business days of the later of: 1) the Effective Date of the Plan; 2) closing on the Bridge Loan, if the Debtor is proceeding under Scenario 1; or 3) sale of the Property if the Debtor is proceeding under Scenario 2. Notwithstanding the foregoing, in the event the Secured Claims are not paid on the four (4) month anniversary of the Effective Date of the Plan, Holders of Secured Claims may exercise any and all rights with respect to such claim under applicable State Law, including, without limitation, any right to foreclose on a lien or deed of trust.

### 4.      General Unsecured Claims.

### a. Class 7 – Buyers

Class 7 is comprised of the claims of Buyers.  "Buyers" is defined under the Plan as a creditor holding a claim arising from an unexpired, unterminated Sale Contract with the Debtor as of the Petition Date, which generally encompasses each party to a Sale Contract with the Debtor as of the Petition Date.  Buyers are separately classified under the Plan for the purposes of explaining the treatment for the Buyers under Plan.

The Plan contemplates two Scenarios.  Scenario 1 contemplates a partial refinance of the Debtor with the closing of a Bridge Loan and the completion of the construction with a subsequent construction loan.  Under Scenario 2, the Property will be sold and the proceeds distributed to creditors in the order of priority under the Plan.

Assuming that the Debtor is proceeding under Scenario 1, Buyers may elect to have their Sale Contract assumed by the Debtor or to reject the Sale Contract.  If the Sale Contract is assumed by the Debtor, all terms remain in place in the Sale Contract, including the final purchase price of the unit and any concessions or amenities previously offered by the Debtor, such as pre-payment of HOA dues, or any other specific terms.  Rejection of the Sale Contract terminates the Sale

Contract and entitles the Buyer to file a claim for any damages that will be treated as a Class 8 General Unsecured Claim.

The election for assumption the respective Sale Contract must be made at the time of voting to accept the Plan.  Electing for assumption of a Sale Contract does not constitute a vote to accept the Plan unless such vote is made in conjunction with the election.  Electing for rejection of a Sale Contract will not constitute rejection of the Plan unless such a vote is in conjunction with the election.  If no election is made, **the Sale Contract will be deemed assumed.**

If the election for assumption is made, the electing Buyer thereby agrees that:

1. No monetary cure is due in connection with the assumption of the Sale Contract;
2. The Debtor has provided adequate assurance of future performance;
3. The Electing Buyer will remain bound by the terms of the Sale Contract and will remit final payment for the purchased unit upon issuance of a Certificate of Occupancy or as otherwise provided in the Sale Contract;
4. The Debtor will remain bound by the terms of the Sale Contract, including the price of the sold unit and the amenities contemplated therewith, including prepayment of certain HOA dues as applicable in the subject contract; and
5. The Electing Buyer is waiving any right to further payment under the Plan.

If the Debtor is proceeding under Scenario 2, either because it is unable to close on the Bridge Loan or is proceeding with a pre-confirmation sale, **all elections shall be null and void, all Sale Contracts shall be deemed rejected, and all Class 7 Claimants shall be treated as Class 8 General Unsecured Creditors.**

### b. Class 8 – General Unsecured Claims

Class 8 is comprised of the General Unsecured Claims against the Debtor.  The Distributions to Class 8 Creditors will depend on the scenario under which the Debtor proceeds.

Scenario 1 – Refinance

If the Debtor is proceeding with a refinance through a closing the Bridge Loan, beginning on the earlier of: 1) the eighteen month anniversary of the Effective Date of the Plan, or 2) the date on which the Debtor completes its first unit, the Debtor will, at the end of each month set aside 50% of its Net Revenue into a segregated account ("Unsecured Creditor Account").  Each time three deposits have been deposited into the Unsecured Creditor Account, the Debtor shall make distributions to Class 8 Creditors on a pro rata basis.  Distributions shall continue until Class 8 Creditors are paid in full.

Assuming that the Debtor completes the first unit through the issuance of a Certificate of Occupancy approximately eighteen months after the Effective Date of the Plan, the Debtor anticipates that Class 8 Claims shall be paid in full approximately six (6) months thereafter if all of the Buyers elect to have their Sale Contracts assumed.  If the Buyers reject their Sale Contracts, payment of the Class 8 Claims will likely take longer than six months, but are anticipated to be paid in full no later than three (3) years after the Effective Date of the Plan.

20

Scenario 2 – Sale of Property

If the Debtor is proceeding with a sale of the Property, the Debtor shall work with professionals to maximize the value of the Property.  Upon sale of the Property, the Proceeds shall be used first to satisfy the Class 1 through 6 Claims and any Administrative Expense Claims, and any remaining amount shall be distributed on a pro rata basis to Class 8 Creditors.

 In addition to the distributions set forth above, Class 8 shall be entitled to receive the proceeds whether obtained by litigation or settlement, net of attorney fees, expert fees, costs, obtained from any Causes of Action pursued by the Debtor.

6.     **Class 9 – Interests in Uptown 240, LLC.**

Class 9 includes the Interests in Uptown 240, LLC.  Class 9 is unimpaired and this paragraph shall govern its treatment.  On the Effective Date of the Plan, Class 9 shall retain its Interests in Uptown 240.

The Debtor believes that even to the extent that the Class 8 creditors vote to reject the Plan, the Plan still complies with the absolute priority rule and is confirmable over the rejection of unsecured creditors pursuant to 11 U.S.C. § 1129, as Class 9 creditors will either be paid in full, assuming that the Debtor is proceeding with the Bridge Loan and completion of construction under Scenario 1, or will receive all remaining sale proceeds if the Property is sold under Scenario 2.

**C.     Bridge Loan or Sale**

**Scenario 1 - Refinancing of the Debtor.**

Within five (5) business of the Confirmation Date or such later date as may be set by the Court, the Debtor will be required to close a Bridge Loan in an amount of not less than $15.7 million in funding to the Debtor, including any holdbacks or escrowed amounts.  The amount of the new loan is subject to the amount of funds agreed to be advanced by the new lender and the Debtor will file a notice of the final loan amount at least (3) days prior to any hearing on Confirmation of the Plan. The Proceeds of the Bridge Loan will be distributed in accordance with the terms of the Plan.

The Debtor has received a Commitment Letter from Fairchild that is attached hereto as Exhibit C.  The commitment letter remains subject to confirmation of the Plan and completion of final loan documents, and upon closing, will provide the Debtor with a loan in the amount of $15.7 million for a partial refinance.  The proposed loan has a variable interest rate based on the 1 month Secured Overnight Financing Rate plus 8.81 base percental points.  The proposed loan further has an origination fee in the amount of approximately $628,000, and includes an interest and escrow reserved that will provide for payments of interest on the loan and other amounts, including property taxes.

Pre- and post-Petition Date, the Debtor has met with a number of other prospective lenders and as of the date of filing this Disclosure Statement, has not received a better offer from any other prospective lender.  Fairchild has also provided a Conditional Commitment Letter for a subsequent

construction loan.  The Debtor therefore believes that proceeding with the proposed loan from Fairchild will most efficiently allow it to fund the Plan and proceed with a partial refinance and completion of the construction as contemplated in Scenario 1.   The Debtor reserves the right to proceed with a different lender if it receives a better offer.

**If the Debtor is unable to close on a Bridge Loan within five (5) business days of the Confirmation Date, then the Debtor shall immediately proceed with Scenario 2.**

## Scenario 2 - Sale of the Property.

In consultation with the Committee and Secured Creditors, the Debtor may sell the Property pursuant to 11 U.S.C. 363 prior to confirmation of this Plan.  While the Debtor shall consult with the Committee and Secured Creditors, the Debtor retains sole discretion to determine whether to proceed with a sale ahead of confirmation of the Plan.

Alternatively, if the Debtor does not proceed with a pre-Confirmation Date sale and is not able to close on the Bridge Loan within five (5) days of the Confirmation Date, the Debtor shall immediately engage a commercial real estate broker in consultation with the Committee.  For any post-confirmation sale, the Debtor will have authority to sell the Property free and clear of liens, claims, and encumbrances pursuant to 11 U.S.C. § 363(f), with any liens attaching to Proceeds to the extent not paid at closing, the listing price for the Property shall be determined by the Debtor in its sole discretion in consultation with retained professionals.  Proceeds from any sale of the Property will be distributed in accordance with the Plan.

The Debtor has met with Hilco Real Estate about acting as a broker for the Property.  As of the date of filing this Disclosure Statement, no broker has been engaged by the Debtor. If a broker is engaged pre-confirmation, an application to employ will be filed with the Bankruptcy Court.

D.    **Management and Means for Execution of the Plan.**

Pursuant to the Plan, the Debtor shall be empowered to take such action as is necessary to effectuate the terms of the Plan.  Danilo and Chantelle Ottoborgo shall retain their positions with the Debtor.  Assuming that the Debtor is proceeding under Scenario 1, Mr. and Ms. Ottoborgo shall receive salaries between $125,000 and $150,000 per year if the following conditions are met: 1) a successful closing on the Bridge Loan **and** Construction Loan; and 2) a successful remobilization of construction efforts.   If the conditions are not met, Mr. and Ms. Ottoborgo will not receive compensation from Uptown 240, either directly or through transfers to IGADC.

E.    **Oversight Meetings and Management Consultants**

On first Thursday of each month,  the Debtor shall host a meeting for Buyers, Creditors, any representative thereof, including without limitation, any representative of the Town of Dillon, and any other party in interest.  Such meetings will be conducted in person with an option for parties to observe virtually by Zoom.  Five (5) days prior to each meeting, Buyers and Creditors may submit questions to the Debtor to be addressed at the subsequent meeting.

In addition to the Oversight Meetings set forth above, the Debtor shall engage an independent management firm during construction to serve as the primary liaison for creditors, Buyers, the Town of Dillon, and any other parties in interest to promote open dialogue and forthright communications.  The management company will further provide assistance to ensure the Debtor remains in compliance with the terms of the Plan and facilitate coordination with contractors to ensure adherence to project timelines, facilitate contract negotiations, track and manage permits and change orders, and aid in ensuring that the project remains compliant with all applicable budgets.

The Debtor anticipates retaining Diversified Consulting Solutions, Inc. ("DCS") to act as the independent management firm and provide a representative for the Buyers and other parties in interest.  Additional background information on DCS is attached hereto as Exhibit E.

**F.      Exculpation.**

**Except as set forth in this Plan, neither the Debtor nor the Creditors' Committee nor any of their agents, representatives, attorneys, accountants or advisors shall have or incur any liability in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming the Plan, or any contract, instrument, release or other agreement, or document created or entered into in connection with the Plan or any other act taken or omitted to be taken in connection with the restructuring of the Debtor pursuant to the Plan during the pendency of the Debtor's Chapter 11 Cases and through the date of confirmation of the Plan; provided that the foregoing shall have no effect on the liability for a breach of the Plan or any other document, instrument, or agreement executed and delivered in connection with the Plan, or that otherwise results from any act or omission that is determined in a Final Order to have constituted gross negligence, bad faith, or willful misconduct; provided further that nothing in this Plan shall limit the liability of any retained attorney in violation of Rule 1.8(h)(1) of the Colorado Rules of Professional Conduct.  For the avoidance of a doubt, there shall be no liability limitation for the Debtor, its Insiders, and affiliates for their actions or omissions occurring before the Petition Date, *or after the Confirmation Date*, or their actions or omissions after the Petition Date that are not official actions made in good faith, nor shall it release the Debtor from any obligations arising under contracts entered into on a post-petition basis.**

## IX.    PLAN FEASIBILITY

The Debtor's Plan is feasible based upon the Debtor's ability to achieve the various components of the Plan.  The Debtors' Plan is contingent on the occurrence of certain events, and will not become effective until: 1) an Order is entered confirming the Debtors' Plan and the Order becomes final; 2) the Confirmation Date has occurred; 3) no request for revocation of the Confirmation Order under Bankruptcy Code section 1144 shall have been made, or if made, remain pending; 4) and either the closing on the Bridge Loan shall have occurred OR, if the Debtor sells the Property prior to confirmation or the Debtor is unable to close on a Bridge Loan within five (5) days of the Confirmation Date of the Plan, the Debtor retains a licensed broker to commence a sale process.

Assuming that the Debtor is proceeding with Scenario 1, the feasibility of the Plan is further supported by the commitment letter from Fairchild which would provide the Bridge Loan, and the conditional commitment letter for the Construction Loan in the amount of $49,200,000. As set forth on the Debtor's pro forma, attached hereto as Exhibit B, the total cost to complete construction on the Property, including estimated interest for the Construction Loan is anticipated to be $58,771,192 comprised primarily of construction costs in the estimated amount of approximately $30 million. Funding will come primarily from the Construction Loan, with a portion to come from the sale of a Tax Increment Financing Bond. If the Debtor is unable to sell the Bond, or there are cost overruns, additional funds will be available from the sale of additional condo units.

Pre-petition, the Debtor sold approximately 40 condo units and received $6 million in funds from the deposits for the units. Deposits typically represented 10-20% of the final purchase price, although some deposits were higher. Based on the increase in property values in Summit County, the Debtor anticipates that the sale price of subsequent units will be higher than those units previously sold, resulting in higher deposits, and more available funds for any construction cost overruns. Furthermore, total value of the units upon completion is anticipated to be $69 and $73 million depending on the market when the units are sold. There will therefore be sufficient value to pay all debts in full, including the Bridge Loan and Construction Loan, even without a sale of the commercial space.

In the alternative, if the Debtor is not proceeding under Scenario 1 and is instead proceeding under Scenario 2, then the Plan is feasible as the Debtor will be retaining a broker for the purpose of marketing and selling the Property. The sale price will ultimately depend on the market, but given the location and the demand for real property in the area, the Debtor anticipates that a sale could be effectuated within four months following the retention of a licensed broker and commencement of a sale process.

## X.    RISK TO CREDITORS

This Disclosure Statement contains statements which look into the future. There is no way to determine the accuracy of these statements. The Debtor has attempted to be conservative in its analysis and believes that the Plan as proposed offers the best option for creditors. The primary risk to creditors are: 1) that the Debtor will be unable to close on a Construction Loan, which will cause delays in the project and a possible sale or foreclosure; 2) that the Debtor will be unable to secure a continuation of their existing planned unit development agreement or a new planned unit development agreement, which will cause construction to be delayed; 3) that the construction will take longer and be more expensive than anticipated, delaying payments to creditors. There is also a risk that the real estate market softens or drops, resulting in a decrease in the value of the condominium units. There is a risk from major catastrophic weather events, such as avalanches, extreme snow storms, and other adverse weather events.

The Projections provide a conservative estimation of the Debtors' anticipated projected revenue, based on historical performance and the efforts undertaken to restructure its operations during the bankruptcy case. The principal alternative to the Debtors' reorganization under Chapter 11 is a conversion of the case to Chapter 7 of the Bankruptcy Code. As set forth in Section XII below, liquidation of the Debtors will assure a distribution to unsecured creditors less than that proposed by the Plan.

## XI.   TAX CONSEQUENCE

The Debtor is not providing tax advice to creditors or interest holders. **U.S. Treasury Regulations require you to be informed that, to the extent this section includes any tax advice, it is not intended or written by the Debtors or their counsel to be used, and cannot be used, for the purpose of avoiding federal tax penalties.** Each party affected by the Plan should consult its own tax advisor for information as to the tax consequences of Plan confirmation. Generally, unsecured creditors should have no tax impact as a result of Plan confirmation. The recovery of each creditor is payment on account of a debt and generally not taxable, unless the creditor wrote off the debt against income in a prior year in which case income may have to be recognized. Interest holders may have very complicated tax effects as a result of Plan confirmation.

## XII.   LIQUIDATION ANALYSIS

The principal alternative to a Debtor's reorganization under Chapter 11 is a conversion of the case to Chapter 7 of the Bankruptcy Code. Chapter 7 requires the liquidation of the debtors' assets by a Trustee who is appointed by the United States Trustee's office. In a Chapter 7 case, the Chapter 7 Trustee would take over control of the debtors' assets. The assets would be liquidated, and the proceeds distributed to creditors in the order of their priorities.

If the Debtor's case was converted to cases under Chapter 7, JGJP continue to pursue relief from stay to foreclose on the Debtors' assets and the likelihood of JGJP Dillon obtaining relief from stay would increase substantially. If JGJP forecloses on the Debtor's Property, there will be no value for any other creditors. Even if relief from stay was not granted, and assets were instead liquidated by the Chapter 7 Trustee, it is likely that unsecured creditors would receive less than the amounts proposed in the Plan, as secured claimants would likely not agree to reduce their claims, and the sale price could be depressed *because* it is being sold in a Chapter 7 as opposed to being sold by the Debtor under the Plan. Furthermore, the unsecured claims against the estate would increase by approximately $6 million from the claims of Buyers, as no Sale Contracts would be assumed, and the administrative claims, including the statutory amount due to the Chapter 7 Trustee, would increase to approximately $1 million.

As a result, as set forth on the Liquidation Analysis attached hereto as Exhibit F unsecured creditors will receive approximately 67% on account of their claims if all claims are currently filed, or will be paid in full if the claim of Air-Tel is disallowed and the Property is sold for $27 million. In contrast, the Plan provides for either the payment in full of unsecured claims under Scenario 1 assuming the Debtor secured financing, or a distribution of sale proceeds under Scenario 2. The Debtors' Plan therefore provides a significantly greater recovery for creditors of both Debtors, and the Debtors urge creditors to vote to accept the Plan.

DATED: May 26, 2023

UPTOWN 240, LLC

By: ___/s/ Danilo Ottoborgo_____
    Danilo Ottoborgo, President


Kutner Brinen Dickey Riley, P.C. ("KBDR") has acted as legal counsel to the Debtor on bankruptcy matters during the Chapter 11 case. KBDR has prepared this Disclosure Statement with information provided primarily by the Debtor. The information contained herein has been approved by the Debtor. KBDR has not made any separate independent investigation as to the veracity or accuracy of the statements contained herein.

Counsel to the Debtor and Debtor- In-Possession:

KUTNER BRINEN DICKEY RILEY, P.C.


By:    _/s/ Keri L. Riley_____
       Keri L. Riley
       1660 Lincoln St., Suite 1720
       Denver, CO 80264
       Telephone: (303) 832-2400
       Email:  klr@kutnerlaw.com

## EXHIBITS TO DISCLOSURE STATEMENT

Exhibit A:      Creditor Analysis

Exhibit B:      Pro Forma

Exhibit C:      Commitment Letter for Bridge Loan

Exhibit D:      Conditional Commitment Letter for Construction Loan

Exhibit E:      Background of Diversified Consulting Solutions, Inc.

Exhibit F:      Liquidation Analysis

# Exhibit A

Exhibit A
Creditor Analysis

| Name | Scheduled Claim Amount | Proof of Claim | Amount of Claim for Class 8 Analysis | Notes |
|------|------------------------|----------------|--------------------------------------|-------|
| Bartles, Aaron | Unknown | $835,000 (Proof of Claim No. 14) | $ 835,000.00 | Purchase Agreement |
| Bieber, Brad and Michelle | Unknown | $131,800 (Proof of Claim No. 19) | $ 131,800.00 | Purchase Agreement |
| Blyth, Margaret | Unknown | $139,800 (Proof of Claim No,. 24) | $ 139,800.00 | Purchase Agreement |
| Connolly, Paul and Jeanne | Unknown | $105,000 (Proof of Claim No. 28) | $ 105,000.00 | Purchase Agreement |
| CTL Thompson | $ 13,047.00 | | $ 13,047.00 | |
| Dahl, Dan and Jen | Unknown | $133,895.75 (Proof of Claim No. 18) | $ 133,895.75 | Purchase Agreement |
| Epstein, Sandra and Russell | Unknown | | $ - | Purchase Agreement |
| Faelan, Crystal and Randy | Unknown | | $ - | Purchase Agreement |
| Follett, Matthew and Jill | Unknown | $169,800 (Proof of Claim No. 13) | $ 169,800.00 | Purchase Agreement |
| Greve, Landon/Bergman, Gary | Unknown | | $ - | Purchase Agreement |
| Group 4G's | $ 507,472.50 | $225,880.56 (Proof of Claim No. 30) | $ 225,880.56 | |
| Hanan, Alan | Unknown | | $ - | Purchase Agreement |
| Holland & Hart | $ 200,891.50 | $218,520.50 (Proof of Claim No. 1) | $ 218,520.50 | Attorney Fees |
| Holt, David and Zoe | Unknown | $127,800 (Proof of Claim No. 27) | $ 127,800.00 | Purchase Agreement |
| Innovise Business Consultants | $ 202,000.00 | $223,456.46 (Proof of Claim No. 10) | $ 223,456.46 | Insurance |
| John and Melissa Hourigan | $ 153,000.00 | | $ - | Treated as a Secured Creditor |
| Johnson, Beth and Josh | Unknown | $70,400 (Proof of Claim No. 41) | $ 70,400.00 | Purchase Agreement |
| Koldyke, Brian and Amy | Unknown | $123,800 (Proof of Claim No. 26) | $ 123,800.00 | Purchase Agreement |
| LaPierre, Richard and Monty | Unknown | $134,530 (Proof of Claim No. 23) | $ 134,530.00 | Purchase Agreement |
| Linsenbigler, Scott | Unknown | | $ - | Purchase Agreement |

Exhibit A
Creditor Analysis

| Name | Scheduled Claim Amount | Proof of Claim | Amount of Claim for Class 8 Analysis | Notes |
|---|---|---|---|---|
| Lyon, Nik | Unknown | | $ - | Purchase Agreement |
| Mammel, Nancy | Unknown | $148,800 (Proof of Claim No. 17) | $ 148,800.00 | Purchase Agreement |
| Melbourne Studios | $ 23,082.50 | | $ 23,082.50 | |
| Mell, Will and Jen | Unknown | $123,800 (Proof of Claim No. 25) | $ 123,800.00 | Purchase Agreement |
| MNJ Conslting by Design, Inc., LLC | $ 252,776.24 | $263,517.51 (Proof of Claim No. 32) | $ 263,517.51 | |
| Molaie, Majid | Unknown | $86,487 (Proof of Claim No. 10) | $ - | Purchase Agreement |
| O'Brien, Barba | Unknown | $86,000 (Proof of Claim No. 9) | $ 86,000.00 | Purchase Agreement |
| Oshman, Mark and Jen | Unknown | $167,800 (Proof of Claim No. 6) | $ 167,800.00 | Purchase Agreement |
| Phelps, Marcella and Justin | Unknown | 0 | $ - | Purchase Agreement |
| Ritchie, Rick | Unknown | 0 | $ - | Purchase Agreement |
| Ruffing, Barb and Andy | Unknown | 0 | $ - | Purchase Agreement |
| Ryan Pope | Unknown | 0 | $ - | |
| Salzman, Harry | Unknown | $144,103 (Proof of Claim No. 4) | $ 144,103.00 | Purchase Agreement |
| Schlottmann, Brian/Wee, Joanne | Unknown | 0 | $ - | Purchase Agreement |
| Sherman, Mike | Unknown | 0 | $ - | Purchase Agreement |
| St. Germain, Eric (now 323 Dillon, LLC) | Unknown | $768,260 (Proof of Claim No. 36) | $ 768,320.00 | Subject to Objection; Amount in claim is total purchase price of Unit, Deposit was $33,00 |
| Studio PBA | Unknown | $390,491 (Proof of Claim No. 7) | $ 390,491.00 | Purchase Agreement |
| Tonniges, Brett | Unknown | 0 | $ - | Purchase Agreement |
| Vann, Alvin | Unknown | 0 | $ - | Purchase Agreement |
| Walley, Ned | Unknown | 0 | $ - | Purchase Agreement |
| Ward, Angie | Unknown | $580,300 (Proof of Claim No. 22) | $ 580,300.00 | Purchase Agreement |
| Wardak, Chris | Unknown | | $ - | Purchase Agreement |

Exhibit A
Creditor Analysis

| Name | Scheduled Claim Amount | Proof of Claim | Amount of Claim for Class 8 Analysis | Notes |
|---|---|---|---|---|
| Whatley, Kevin and Lisa | Unknown | | $ - | Purchase Agreement |
| Witte, Dan and Melanie | Unknown | $143,800 (Proof of Claim No. 11) | $ 143,800.00 | Purchase Agreement |
| Cochran, Joel | N/a | $100,000 (Proof of Claim No. 16) | $ 100,000.00 | Purchase Agreement |
| CalComm Mining Corp. | N/a | $32,500 (Proof of Claim No. 40) | $ 32,500.00 | |
| Air-Tel, LLC | N/a | $4,827,000 (Proof of Claim No. 37) | $ 4,827,000.00 | Subject to Objection; Based on a lease for which the Debtor is the landlord |
| | | | $ 10,452,244.28 | |

# Exhibit B

**CONFIDENTIAL NOT FOR DISTRIBUTION** UPTOWN 240 PRO FORMA & SOURCES AND USES

| Sources | | Uses | |
|---|---|---|---|
| Construction Loan | $49,752,827 | Construction Costs | $30,390,371 |
| Interest Reserve | $4,455,879 | Infrastructure & Earthwork | $689,942 |
| TIF Bond Sale | $4,562,486 | Design/Municipal | $2,475,026 |
| **Total Sources** | **$58,771,192** | Land Lease/Marketing/Int Design/Misc | $525,204 |
| | | G&A/Consulting/Misc. | $1,508,549 |
| **Assumptions** | | Phase One Costs | $16,963,720 |
| Construction Length | 18 months | Other | $1,762,500 |
| Construction Interest Rate | 7.75% | Development Cost W/O Interest | $54,315,313 |
| Construction Loan Fees | 2.25% | Construction Interest | $4,455,879 |
| | | **Total Uses** | **$58,771,192** |
| Project Value | $ 96,707,522.85 | | |
| LTV | 61% | | |
| Profit Ratio | 39% | Produced by | |
| Developer Contr. | 44% | Danilo Ottoborgo | |







# Uptown 240

May 18, 2023

**Soft Cost Budget**

| | Building Total Sqft | **179,695** | | |

| Scope | Starting Value | Work Complete | Adjustment | Remaining |
|---|---|---|---|---|
| **Architect** | | $ 448,300.00 | $ (448,300.00) | |
| MEP (DCME) | $ 93,800.00 | $ 76,826.93 | $ 2,304.81 | $ 19,277.88 |
| Structural Engineer (IMEG/Monroe Newell) | $ 131,000.00 | $ 108,513.60 | $ 46,660.85 | $ 69,147.25 |
| Envelope and Testing (Pie) | $ 126,000.00 | $ 30,411.00 | $ 912.33 | $ 96,501.33 |
| Acoustical (DL Adams) | $ 18,500.00 | $ 12,100.06 | $ 363.00 | $ 6,762.94 |
| Engergy Code Compliance (Group 14) | $ 4,200.00 | $ 4,200.00 | $ 126.00 | $ 126.00 |
| Accessibility (Kessler) | $ 29,900.00 | $ 9,700.00 | $ 291.00 | $ 20,491.00 |
| Restart Fee | | | $ 390,000.00 | $ 390,000.00 |
| **SUBTOTAL** | **$ 403,400.00** | **$ 690,051.59** | **$ 440,657.99** | **602,306.40** |
| Engineering | | | | |
| Civil Engineer | $ 174,400.00 | $ 158,608.53 | $ 47,582.56 | $ 63,374.03 |
| Site Survey and Soils Report | | | $ - | $ - |
| Condo Map | $ 15,000.00 | $ - | $ 65,000.00 | $ 80,000.00 |
| Material Testing, Inspections, and Consultants (CTL) | $ 158,390.00 | $ 34,714.75 | $ 27,771.80 | $ 151,447.05 |
| **SUBTOTAL** | **$ 347,790.00** | **$ 193,323.28** | **$ 140,354.36** | **294,821.08** |
| Municipal | | | | |
| Town of Dillon Impact Fee(s) | $ 67,851.16 | $ 67,851.16 | $ 47,732.00 | 47,732.00 |
| Building Dept | $ 228,241.90 | $ 203,449.68 | $ 31,103.49 | 55,895.71 |
| Fire Dept | $ 129,600.00 | $ 129,600.00 | $ 18,888.00 | 18,888.00 |
| Development Agreement Letter of Credit | $ 332,000.00 | $ 67,851.16 | $ 264,246.40 | 528,395.24 |
| | | | $ - | $ - |
| **SUBTOTAL** | **$ 757,693.06** | **$ 468,752.00** | **$ 361,969.89** | **650,910.95** |
| G&A/Consulting/Misc. | | | | |
| Admin (IGADC) | $ 607,000.00 | $ 570,084.00 | $ (20,000.00) | $ 16,916.00 |
| Admin (MNJ) | $ 555,000.00 | $ 444,847.00 | | $ 110,153.00 |
| Developer: Namesake LLP | $ 720,000.00 | $ 78,275.00 | | $ 641,725.00 |
| Telecom | $ 5,000.00 | | $ 15,000.00 | $ 20,000.00 |
| 3rd Party Development team (DCS) | $ 230,839.45 | $ 123,396.95 | $ 7,500.00 | $ 114,942.50 |
| Land Lease Agreement (Site Trailers/Staging) | $ 48,200.00 | $ - | $ 48,000.00 | $ 96,200.00 |
| Temp Power | $ 32,062.09 | $ 22,062.09 | $ 15,000.00 | $ 25,000.00 |
| Weather Premiums | $ 375,000.00 | $ 231,441.02 | $ 75,000.00 | $ 218,558.98 |
| Marketing | $ 156,386.00 | $ 55,547.00 | $ 45,000.00 | $ 145,839.00 |
| Interior Designer | $ 55,000.00 | $ 39,393.92 | $ 24,000.00 | $ 39,606.08 |
| FF&E | $ 45,000.00 | $ - | $ 35,000.00 | $ 80,000.00 |
| **SUBTOTAL** | **$ 2,829,487.54** | **$ 1,565,046.98** | **$ 244,500.00** | **1,508,940.56** |
| Legal/Insurance/Taxes | | | | |
| Legal | $ 200,000.00 | $ 115,623.00 | $ 125,000.00 | $ 209,377.00 |
| WRAP Insurance and WRAP Management | $ 1,049,074.84 | $ 1,210,074.84 | $ 650,000.00 | $ 489,000.00 |
| 3rd Party Insurances (DSS) | $ 48,000.00 | $ 27,187.50 | $ 15,000.00 | $ 35,812.50 |
| Accounting | $ 25,000.00 | $ 2,500.00 | $ 20,000.00 | $ 42,500.00 |
| Taxes | $ 120,000.00 | | $ 55,000.00 | $ 175,000.00 |
| | | | $ - | $ - |
| **SUBTOTAL** | **$ 1,442,074.84** | **$ 1,355,385.34** | **$ 865,000.00** | **951,689.50** |
| **Subtotal** | **$ 5,780,445.44** | **$4,272,559** | **$2,052,482** | **$4,008,668.49** |
| | | | | |
| **Subtotals** | **$ 5,780,445.44** | **$ 4,272,559.19** | **$** | **4,008,668.49** |
| | | | | |
| Additional & Deferred | | | | |
| **TOTAL** | **$ 7,215,768.11** | **$ 4,955,893.86** | **$** | **4,008,668.49** |

ATTACHMENT TO PAY APPLICATION

| Uptown 240 | APPLICATION NUMBER: | One (1) |
| 240 Lake Dillon Rd | APPLICATION DATE: | TBD |
| Dillon, CO 80435 | PERIOD TO: | TBD |
| | PROJECT NO: | 19-009 |

| A | B | D | F | G | I | J | L | M | N | O | P |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Ite m No. | Description of Work | Scheduled Value | Reallocation Budget Transfer | Revised SOV (D + E + F) | Work Completed From Previous Applicati on | This Period | Materials Presently Store d (Not I or J) | Total Completed And Stored To (I + J + L) | % (M / D) | Balance To Finish (G - M) | Total Retainage M * 10% |
| 1 | General Conditions / OH&F | | | | | | | | | | |
| 2 | o Pre-con &Mobilization(1%) -No Ret | $20,000.00 | $  15,000.00 | $35,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $35,000.00 | $ 0.00 |
| 3 | o General Requirements - No Ret -Lump Sum | $502,953.28 | | $502,953.28 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $502,953.28 | $ 0.00 |
| 4 | o Lodging / Per Diem - No Ret -Lump Sum | $41,585.78 | $  12,000.00 | $53,585.78 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $53,585.78 | $ 0.00 |
| 5 | o Overhead & Fee (4%) | $533,472.95 | | $533,472.95 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $533,472.95 | $ 0.00 |
| 6 | o Traffic Control - Allowance | $126,280.50 | | $126,280.50 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $126,280.50 | $ 0.00 |
| 7 | o Contingency  (No FEE Attached) | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $0.00 | $ 0.00 |
| 8 | o GCs Delay Day Allowance (50 days) | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $0.00 | $ 0.00 |
| 9 | o Weather Related Premiums Allowance | $50000.00 | $  25,000.00 | $75,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $75,000.00 | $ 0.00 |
| 10 | Facility Construction Group | 0 | | | | | | | | | |
| 11 | 02 - Existing Conditions | 0 | | | | | | | | | |
| 12 | o Layout & Survey / Certifications | $22,403.86 | | $22,403.86 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $22,403.86 | $ 0.00 |
| 13 | 03 - Concrete | 0 | | $0.00 | | | | | | | |
| 14 | o Drilled Piers, CIP, & Site Concrete | $2,586,629.35 | $  250,000.00 | $2,836,629.35 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $2,836,629.35 | $ 0.00 |
| 15 | o Gypsum Cement Underlayment | $458,687.50 | | $458,687.50 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $458,687.50 | $ 0.00 |
| 16 | 04 - Masonry | 0 | | $0.00 | | | | | | | |
| 17 | o CMU & Adhered Stone | $856,835.10 | | $856,835.10 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $856,835.10 | $ 0.00 |
| 18 | 05 - Steel | 0 | | $0.00 | | | | | | | |
| 19 | o Structural Steel | $886,025.80 | $  125,000.00 | $1,011,025.80 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $1,011,025.80 | $ 0.00 |
| 20 | o Metal Fabrications | $245,150.85 | | $245,150.85 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $245,150.85 | $ 0.00 |
| 21 | o Panelized Wall/Floor Systems-No Ret on Mat | $2,705,896.20 | | $2,705,896.20 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $2,705,896.20 | $ 0.00 |
| 22 | 06 - Wood, Plastics and Composites | 0 | | $0.00 | | | | | | | |
| 23 | o Rough Carpentry | $145,780.33 | | $145,780.33 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $145,780.33 | $ 0.00 |
| 24 | o Crane Allowance | $402,983.37 | $  25,000.00 | $427,983.37 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $427,983.37 | $ 0.00 |
| 25 | o Fork/Material Lift | $70,339.50 | | $70,339.50 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $70,339.50 | $ 0.00 |
| 26 | o Fiber Cement Rustic Finishes/Lap Siding | $501,414.03 | | $501,414.03 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $501,414.03 | $ 0.00 |
| 27 | o Interior Arch. Woodwork & Finish Carp. | $625,013.27 | | $625,013.27 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $625,013.27 | $ 0.00 |
| 27 | o Manuf. Faced Casework & Countertops | $543,969.78 | | $543,969.78 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $543,969.78 | $ 0.00 |
| 28 | o Amenity Space Cabinets & Mock Ups-Allow. | $33,000.00 | | $33,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $33,000.00 | $ 0.00 |
| 29 | 07 - Thermal and Moisture Protection | | | | | | | | | | |
| 30 | o Waterproofing & Traffic Coatings | $296,459.19 | $  50,000.00 | $346,459.19 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $346,459.19 | $ 0.00 |
| 31 | o Insulation | $1,288,890.35 | | $1,288,890.35 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $1,288,890.35 | $ 0.00 |
| 32 | o Roofing | $434,622.55 | | $434,622.55 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $434,622.55 | $ 0.00 |
| 33 | o Metal Wall Panels/Siding | $603,162.00 | | $603,162.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $603,162.00 | $ 0.00 |
| 34 | o Fire Stopping | $28,700.00 | | $28,700.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $28,700.00 | $ 0.00 |
| 35 | o Joint Sealants | $59,317.08 | $  20,000.00 | $79,317.08 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $79,317.08 | $ 0.00 |
| 36 | 08 - Openings | | | | | | | | | | |
| 37 | o Doors, Frames & Hardware | $407,463.68 | | $407,463.68 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $407,463.68 | $ 0.00 |
| 38 | o Access Doors & Frames | $6,120.00 | | $6,120.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $6,120.00 | $ 0.00 |
| 39 | o High Speed Roll Up & Service Doors | $130,293.05 | | $130,293.05 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $130,293.05 | $ 0.00 |
| 40 | o Wood Windows & Glazed Patio/Entry Doors | $1,025,058.30 | | $1,025,058.30 | $0.00 | $0.00 | $0.00 | $0.00 | EVALUAT | 0% | $976,246.00 | $ 0.00 |
| 41 | o Storefronts, Glass, & Glazing | $845,104.05 | | $845,104.05 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $845,104.05 | $ 0.00 |
| | Page #1 Sub Total | $16,483,611.69 | $  522,000.00 | $17,005,611.69 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $16,956,799.39 | $ 0.00 |

ATTACHMENT TO PAY APPLICATION

| Uptown 240 | APPLICATION NUMBER: | Sixteen (16) |
| 240 Lake Dillon Rd | PERIOD TO: | 9/30/2020 |
| Dillon, CO 80435 | ARCHITECT'S PROJECT NO: | 19-009 |

| A | B | D | F | G | I | J | L | M | N | O | P |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Ite m No. | Description of Work | Scheduled Value | Reallocation Budget Transfer | Revised SOV (D + E + F) | Work Completed From Previous Application | This Period | Materials Presently Stored (Not In | Total Comp. & Stored To Date (I + J + L) | % (M / D) | Balance To Finish (G - M) | Total Retainage M * 10% |
| 42 | 09 - Finishes | | | | | | | | | | |
| 43 | o CF Metal Framing & Drywall | $2,682,646.72 | | $2,682,646.72 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $2,682,646.72 | $0.00 |
| 44 | o Floor Coverings | $1,204,862.90 | | $1,204,862.90 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $1,204,862.90 | $0.00 |
| 45 | o Int. & Ext. Painting | $690,234.00 | | $690,234.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $690,234.00 | $0.00 |
| 46 | 10 - Specialties | $  - | | $0.00 | $0.00 | $0.00 | | | | | |
| 47 | o Toilet & Fire Protection Accessories | $47,890.33 | | $47,890.33 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $47,890.33 | $0.00 |
| 48 | o Fireplaces | $210,078.80 | | $210,078.80 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $210,078.80 | $0.00 |
| 49 | 11 - Equipment | | | $0.00 | $0.00 | $0.00 | | | | | |
| 50 | o Residential Appliances - Allowance | $287,375.00 | $  35,000.00 | $322,375.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $322,375.00 | $0.00 |
| 51 | 12 - Furnishings | $  - | $  45,000.00 | $45,000.00 | $0.00 | $0.00 | | | | | |
| 52 | 14 - Conveying Equipment | $  - | | $0.00 | $0.00 | $0.00 | | | | | |
| 53 | o Traction Elevator | $153,391.25 | | $153,391.25 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $153,391.25 | $0.00 |
| 54 | o Trash Chute & Compactor | | | | | | | | | | |
| 55 | Facility Services Group | $50,496.63 | | $50,496.63 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $50,496.63 | $0.00 |
| 56 | 21 - Fire Suppression | | | | | | | | | | |
| 57 | o Water Based Fire Suppression System | $613,513.75 | | $613,513.75 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $613,513.75 | $0.00 |
| 58 | 22 - Plumbing | $  - | | $0.00 | $0.00 | $0.00 | | | | | |
| 59 | o Plumbing | $1,732,124.11 | | $1,732,124.11 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $1,732,124.11 | $0.00 |
| 60 | 23 - HVAC | $  - | | $0.00 | $0.00 | $0.00 | | | | | |
| 61 | o HVAC | $3,264,656.63 | | $3,264,656.63 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $3,264,656.63 | $0.00 |
| 62 | 25 - Interagated Automation | $  - | | $0.00 | $0.00 | $0.00 | | | | | |
| 63 | o Controls & Metering | $235,189.33 | | $235,189.33 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $235,189.33 | $0.00 |
| 64 | 26 - Electrical | $  - | | $0.00 | $0.00 | $0.00 | | | | | |
| 65 | o Electrical, Lighting, & Fire Alarm | | | | | | | | | | |
| 66 | Site & Infrastructure | $2,734,300.72 | | $2,734,300.72 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $2,734,300.72 | $0.00 |
| 67 | 31 - Earthwork | | | | | | | | | | |
| 68 | o Earthwork & Utilities | $520,669.99 | $  25,000.00 | $545,669.99 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $545,669.99 | $0.00 |
| 69 | o Erosion Control | $40,704.71 | | $40,704.71 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $40,704.71 | $0.00 |
| 70 | o Shoring (Ret Released at completion) | $  - | $  20,000.00 | $20,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $20,000.00 | $0.00 |
| 71 | 32 - Exterior Paving / Improvements | $  - | | $0.00 | $0.00 | $0.00 | | | | | |
| 72 | o Asphalt Paving, Striping, & Signage | $52,467.70 | | $52,467.70 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $52,467.70 | $0.00 |
| 73 | o Landscaping & Irrigation Allowance | $58,640.00 | | $58,640.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $58,640.00 | $0.00 |
| 74 | o Fencing Allowance | $12,000.00 | | $12,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $12,000.00 | $0.00 |
| 75 | 33 - Site Utilities | $5,460.00 | | $5,460.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $5,460.00 | $0.00 |
| 76 | o Dry Sleeve (Phone/Data) | | | | | | | | | | |
| | Change Orders | | | | | | | | | | |
| | | $0.00 | | $0.00 | $0.00 | $0.00 | | $0.00 | 0% | $0.00 | $0.00 |
| | | $0.00 | | $0.00 | $0.00 | $0.00 | | $0.00 | 0% | $0.00 | $0.00 |
| | Page #2 Sub Total | $14,596,702.54 | $  125,000.00 | $14,721,702.54 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $14,676,702.54 | $0.00 |
| | OVERALL PROJECT TOTALS | $31,080,314.24 | $  647,000.00 | $31,727,314.24 | $0.00 | $0.00 | $0.00 | $0.00 | | $31,633,501.94 | $0.00 |

CONDO UNIT UPGRADE PACKAGES

**Sales Schedule & Registry**
Uptown 240 LLC

| Buyer ID | Price | Sales Status | $/SF |
|---|---|---|---|
| BO | $ 839,000 | Under Contract | $ 677.71 |
| | $ 882,000 | Open | $ 804.74 |
| | $ 1,680,000 | Open | $ 1,177.30 |
| | $ 440,000 | DR/Open | $ 804.39 |
| BN | $ 659,000 | Under Contract | $ 591.56 |
| BM | $ 619,000 | Under Contract | $ 564.78 |
| | $ 910,000 | Open | $ 1,218.21 |
| BL | $ 354,125 | Under Contract | $ 520.01 |
| | $ 1,430,000 | Open | $ 1,002.10 |
| BK | $ 619,000 | Under Contract | $ 564.78 |
| | $ 570,000 | DR/Open | $ 746.07 |
| BJ | $ 269,000 | Under Contract | $ 469.46 |
| | $ 560,000 | DR/Open | $ 757.78 |
| BI | $ 672,650 | Under Contract | $ 550.00 |
| | $ 560,000 | DR/Open | $ 757.78 |
| | $ 560,000 | DR/Open | $ 757.78 |
| BH | $ 399,000 | Under Contract | $ 534.85 |
| BG | $ 385,200 | Under Contract | $ 521.24 |
| BF | $ 765,000 | Under Contract | $ 697.99 |
| | $ 1,720,000 | Open | $ 1,205.33 |
| | $ 14,892,975 | | $ 746.19 |

| BE | $ 719,000 | Under Contract | $ 580.78 |
|---|---|---|---|
| | $ 1,010,000 | Open | $ 921.53 |
| | $ 1,800,000 | Open | $ 1,261.39 |
| | $ 520,000 | DR/Open | $ 803.71 |
| BD | $ 639,000 | Under Contract | $ 574.12 |
| BC | $ 800,000 | Under Contract | $ 729.93 |
| BB | $ 431,040 | Under Contract | $ 577.03 |
| BA | $ 389,000 | Under Contract | $ 571.22 |
| | $ 1,500,000 | Open | $ 1,051.16 |
| AZ | $ 719,000 | Under Contract | $ 656.02 |
| | $ 980,000 | Open | $ 894.16 |
| AY | $ 396,845 | Under Contract | $ 537.00 |
| | $ 520,000 | DR/Open | $ 703.65 |
| AX | $ 625,000 | Under Contract | $ 511.04 |
| | $ 590,000 | DR/Open | $ 798.38 |
| | $ 590,000 | DR/Open | $ 798.38 |
| | $ 1,030,000 | Open | $ 1,007.83 |
| | $ 780,000 | Open | $ 1,055.48 |
| | $ 1,050,000 | Open | $ 958.03 |
| | $ 1,840,000 | Open | $ 1,289.42 |
| | $ 16,928,885 | | $ 814.01 |

| AW | $ 720,500 | Under Contract | $ 581.99 |
|---|---|---|---|
| AV | $ 769,000 | Under Contract | $ 701.64 |
| | $ 1,910,000 | Open | $ 1,338.47 |
| AU | $ 305,000 | Under Contract | $ 471.41 |
| AT | $ 448,300 | Under Contract | $ 402.79 |
| AS | $ 719,000 | Under Contract | $ 656.02 |
| AR | $ 575,000 | Under Contract | $ 769.75 |
| AQ | $ 449,000 | Under Contract | $ 659.32 |
| | $ 1,560,000 | Open | $ 1,093.20 |
| AP | $ 699,000 | Under Contract | $ 637.77 |
| | $ 1,000,000 | Open | $ 912.41 |
| AO | $ 489,000 | Under Contract | $ 661.71 |
| | $ 740,000 | Open | $ 1,001.35 |
| AN | $ 758,260 | Under Contract | $ 620.00 |
| AM | $ 700,000 | Open | $ 947.23 |
| | $ 416,000 | Under Contract | $ 562.92 |
| | $ 1,050,000 | Open | $ 1,027.40 |
| | $ 840,000 | Open | $ 1,136.67 |
| AL | $ 715,000 | Under Contract | $ 652.37 |
| AK | $ 840,000 | Under Contract | $ 588.65 |
| | $ 15,703,060 | | $ 771.15 |

| AJ | $ 866,600 | Under Contract | $ 700.00 |
|---|---|---|---|
| AI | $ 849,000 | Under Contract | $ 774.64 |
| | $ 1,980,000 | Owner Reserved | $ 1,387.53 |
| | $ 740,000 | Open | $ 1,143.74 |
| AH | $ 749,000 | Under Contract | $ 672.96 |
| AG | $ 829,000 | Under Contract | $ 756.39 |
| AF | $ 525,000 | Under Contract | $ 702.81 |
| AE | $ 432,435 | Under Contract | $ 635.00 |
| | $ 1,840,000 | Open | $ 1,289.42 |
| AD | $ 749,000 | Under Contract | $ 683.39 |
| | $ 1,080,000 | Open | $ 985.40 |
| AC | $ 487,740 | Under Contract | $ 660.00 |
| | $ 780,000 | Open | $ 1,055.48 |
| AB | $ 814,000 | Under Contract | $ 665.58 |
| | $ 780,000 | Open | $ 1,055.48 |
| | $ 780,000 | Open | $ 1,055.48 |
| | $ 1,110,000 | Open | $ 1,086.11 |
| AA | $ 645,000 | Under Contract | $ 872.80 |
| | $ 1,320,000 | Open | $ 1,204.38 |
| | $ 1,980,000 | Open | $ 1,387.53 |
| | $ 19,336,775 | | $ 938.70 |

| | $ 66,861,695.00 | | $ 817.52 |
|---|---|---|---|

| | $ 69,228,179.00 |
|---|---|
| *Assumptions based on current inventory and incremental increases throughout selling process* | $ 71,997,306.16 |
| | $ 73,437,252.28 |

| Remaining Condo Sale Summary | |
|---|---|
| Total Current Sold | $ 25,149,695 |
| Buyer Ugrades | $ 3,845,000 |
| | $ 48,287,557 |
| GrossTotal | $ 77,282,252 |
| Gross $/PSF | $ 970.46 |

**Uptown 240 Commercial Revenue Projection**

| Model date: | 5/18/2023 | | | | Closing | 31-Dec-24 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Model: Annualized Periods | | | | | | | | | | | |
| Annual Growth Rate | 2.5% | | | | | | | | | | |

| Restaurant/Commercial | PPSF/Mo | PPSF/Yr | SF | 7 Yr Projected Summary Subtotal | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Restaurant PPSF/YR | | | | | | | | | | | |
| Exterior Patio | $ 2.63 | $ 31.50 | 1,891 | $ 449,574 | $ 59,567 | $ 61,056 | $ 62,582 | $ 64,147 | $ 65,750 | $ 67,394 | 69,079 |
| Interior | $ 3.75 | $ 45.00 | 4,682 | $ 1,590,168 | $ 210,690 | $ 215,957 | $ 221,356 | $ 226,890 | $ 232,562 | $ 238,376 | 244,336 |
| Storage | $ 1.83 | $ 22.00 | 403 | $ 66,916 | $ 8,866 | $ 9,088 | $ 9,315 | $ 9,548 | $ 9,786 | $ 10,031 | 10,282 |
| **Subtotal** | $ 3.33 | 40.01 | 6,976 | $ 2,106,658 | 279,123 | 286,101 | 293,253.08 | 300,584 | 308,099 | 315,801 | 323,697 |
| *See formal presentation for market comparisons and additional information* | | | | | | | | | | | |

| Restaurant/Commercial Parking | | Daily Rate | COUNT | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| North Side Exterior Parking | | $ 25.00 | 13 | $ 895,314 | $ 118,625 | $ 121,591 | $ 124,630 | $ 127,746 | $ 130,940 | $ 134,213 | 137,569 |
| West Lot Exterior Parking | | $ 25.00 | 7 | $ 482,092 | $ 63,875 | $ 65,472 | $ 67,109 | $ 68,786 | $ 70,506 | $ 72,269 | 74,075 |
| Interior Garage Overflow* not overnight/seasonal rates may apply | | $ 15.00 | 20 | $ 826,444 | $ 109,500 | $ 112,238 | $ 115,043 | $ 117,920 | $ 120,868 | $ 123,889 | 126,986 |
| **Subtotal** | | $ 21.67 | 40 | $ 2,203,850 | $ 292,000 | $ 299,300 | $ 306,783 | $ 314,452 | $ 322,313 | $ 330,371 | 338,630 |
| *See formal presentation for market comparisons and additional information* | | | | | | | | | | | |

| Residents Leasable Storage (considered commercial use) | Count | Monthly Rate | Total Mnthly | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Sport/Equipment Lockers | | | | | | | | | | | |
| Ski/Snowboard | 310 | 310 $ 70.00 | $ 620 | $ 1,965,351 | $ 260,400 | $ 266,910 | $ 273,583 | $ 280,422 | $ 287,433 | $ 294,619 | 301,984 |
| 3ft x 3ft | 82 | 738 $ 110.00 | $ 738 | $ 816,934 | $ 108,240 | $ 110,946 | $ 113,720 | $ 116,563 | $ 119,477 | $ 122,464 | 125,525 |
| 5ft x 3ft | 13 | 195 $ 135.00 | $ 195 | $ 158,949 | $ 21,060 | $ 21,587 | $ 22,126 | $ 22,679 | $ 23,246 | $ 23,827 | 24,423 |
| 6ft x 3ft | 5 | 90 $ 150.00 | $ 90 | $ 67,927 | $ 9,000 | $ 9,225 | $ 9,456 | $ 9,692 | $ 9,934 | $ 10,183 | 10,437 |
| 10ft x 8ft | 4 | 320 $ 175.00 | $ 320 | $ 63,398 | $ 8,400 | $ 8,610 | $ 8,825 | $ 9,046 | $ 9,272 | $ 9,504 | 9,741 |
| **Subtotal** | 414 | | $ 1,963 | $ 3,072,559 | $ 407,100 | $ 417,278 | $ 427,709 | $ 438,402 | $ 449,362 | $ 460,596 | 472,111 |
| *See formal presentation for market comparisons and additional information* | | | | | | | | | | | |
| **Gross Commercial Revenues from All Uses** | | | | $ 7,383,066 | 978,223 | 1,002,678 | 1,027,745 | 1,053,439 | 1,079,775 | 1,106,769 | 1,134,438 |

| Expenses (HOA) | SQFT | | Count | 7 Year Projection | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Exterior Parking Maintenance | 3,240 | | 20 | $ (23,812) | $ (3,155) | $ (3,234) | $ (3,315) | $ (3,398) | $ (3,482) | $ (3,570) | (3,659) |
| Interior Parking Maintenance | 3,240 | | 20 | $ (1,223) | $ (162) | $ (166) | 170 | $ (174) | 179 | $ (183) | 188 |
| Storage Lockers Management/Maintenance | 1,963 | | 414 | $ (61,451) | $ (8,142) | $ (8,346) | $ (8,554) | $ (8,768) | $ (8,987) | $ (9,212) | (9,442) |
| Subtotal | 8,443 | | | $ (86,486) | $ (11,459) | $ (11,745) | $ (12,039) | $ (12,340) | $ (12,649) | $ (12,965) | (13,289) |
| **Net Commercial Income (NOI)** | | | | $ 7,296,580 | $ 966,764 | $ 990,933 | $ 1,015,706 | $ 1,041,099 | $ 1,067,126 | $ 1,093,804 | $ 1,121,149 |
| **Telecommunications Royalties** (see tab below) | | | | $ 71,482 | $ 4,500 | $ 5,701 | $ 7,224 | $ 9,153 | $ 11,596 | $ 14,692 | 18,615 |
| **Total NOI** | | | | $ 7,296,580 | $ 971,264 | $ 996,634 | $ 1,022,930 | $ 1,050,251 | $ 1,078,722 | $ 1,108,497 | $ 1,139,765 |

| NPV Valuation of Commercial Space | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NPV Valuation | | | Assessed Values: | $ 19,425,271 | $ 19,932,682 | $ 20,458,594 | $ 21,005,022 | $ 21,574,446 | $ 22,169,933 | $ 22,795,293 | |
| 5.00% | Assessed Value with Cap Rate of 5% | | | | | | | | | | |
| $6,059,072.60 | *Formula: Net Operating Income / Cap Rate of 5% = | | Formula: $971,264 ÷ .05 = $19,425,271 | | | | | | | | |

| Projected Commercial and Residential Market Value | Commercial Cap Rate Value | Total Project Value | | |
|---|---|---|---|---|
| $77,282,252 | $ 19,425,270.56 | $ 96,707,523 | | |

Exhibit C



Fairchild Opportunity Fund LLC
170 Meeting Street
Charleston, SC 29401
843.628.5080    t
866.563.3647    f
fairchildus.com    w

## Fairchild Loan Commitment Letter

May 19, 2023

Danilo Ottoborgo
Uptown 240, LLC
240 Lake Dillon Drive
Dillon, Colorado 80435

Dear Mr. Ottoborgo:

The undersigned Borrower has been approved under the following terms and conditions for bridge financing of the Uptown 240 project, an 80-unit residential for sale condo development/5,000sf commercial development located at 240 Lake Dillon Drive Dillon Colorado 80435.

**LOAN APPROVAL TERMS:**

| | |
|---|---|
| **LENDER:** | Fairchild Opportunity Fund LLC |
| **BORROWER/ GUARANTOR:** | Established, approved, or to be formed special purpose entity for purposes of bridge financing for the subject property Uptown 240 LLC, A Colorado Limited Liability Company/ Danilo Ottoborgo, Chantelle Ottoborgo, Lenny Goldfarb and Fairchild internal credit enhancement |
| **PROPERTY ADDRESS:** | 240 Lake Dillon Drive Dillon Colorado 80435 - Please reference Exhibit A for associated property specifications |
| **ALLOCATION TYPE:** | Bridge Financing |
| **TYPE OF PROPERTY:** | Residential For Sale Condominium/Commercial (Retail) |
| **LOAN AMOUNT:** | A loan in the amount of fifteen million seven hundred thousand ($15,700,000) dollars |
| **TYPE OF FACILITY:** | Floating Rate |
| **USE OF PROCEEDS:** | Bridge financing, interest reserve, closing costs/fees |
| **LTV:** | Sixty (60%) percent of as is value; as determined by an independent appraisal ordered by and acceptable to Fairchild |
| **TERM/MATURITY DATE:** | A total of twelve (12) months from the date of Closing |
| **INTEREST RATE:** | An interest rate of 1-Mo SOFR + eight hundred eighty-one (881) bps |
| **AMORTIZATION:** | An interest only repayment schedule shall apply |
| **GUARANTEE/RECOURSE:** | Recourse |
| **PREPAYMENT:** | 6-month minimum interest |
| **ASSUMPTION:** | N/A |

Borrower's Initials:

_____

| | |
|---|---|
| **ESCROWS/RESERVES:** | Debt service reserve for bridge period; Other Escrow. Lender will escrow for payment, on a monthly basis, one twelfth (1/12th) of the annual real estate taxes and one twelfth (1/12th) of the annual property and liability insurance premiums, plus an additional amount at closing sufficient to ensure that Lender will have sufficient funds in escrow, in advance, to make timely payment. |
| **ORIGINATION FEE:** | An origination fee based upon the below mentioned percentage of the final loan amount shall become due and payable by Borrower to Fairchild at the time of issuance of the funding commitment and disbursed at time of closing:<br>Four (4.0%) percent of the final consolidated loan amount |
| **APPLICATION DEPOSIT:** | An Application Deposit - *previously paid*<br><br>The total application deposit amount is estimated to be sufficient for the aforementioned purposes, but in the event actual out-of-pocket costs incurred by the Lender are in excess of this estimate, Borrower agrees to pay such excess amount, even if a Lender's Commitment is not issued and/or the Loan does not close. Provided the Deposit is sufficient for such expenses, Lender will pay for such expenses using the funds on deposit and will refund any excess to Borrower (verified against receipts). Borrower's acceptance of this CL shall serve as its authorization for Lender to finalize all due diligence required prior to closing, as required.  Closing costs include: (i) Policy premiums for lender's Title Policy; (ii) Delivery of survey acceptable to Fairchild; (iii) Lender and Advisor fees; (iv) Mortgage and documentary stamp taxes, recording fees, and similar expenses; (v) Legal Costs; and (ix) Other customary closing costs.  Borrower is also responsible for its own legal fees and costs.  Any unused funds collected at the time of application shall be credited to the Borrower at time of closing. |
| **CONSTRUCTION FINANCING:** | During the term of the bridge loan, Fairchild shall reserve the exclusive right to structure construction financing by providing competitive financing options based upon the then prevalent market conditions. |
| **COLLATERAL:** | The Loan shall be evidenced by the promissory note of Borrower secured, inter alia, by:<br>(i) All acres of land including all improvements of subject properties outlined in Exhibit A;<br>(ii) A first priority assignment of all profits;<br>(iii) A first priority and perfected security interest in all personal Property, licenses, permits, contract rights, general intangibles and other assets of Borrower used in connection with the operation, maintenance, and management of the Property;<br>(iv) Assignments of equity interests in businesses related to the Property and UCC liens on all business assets;<br>(v)  Such other collateral as may be specified in the Loan Documents. |
| **AUTHORIZATION:** | Borrower and/or the undersigned hereby authorize Lender to fully act on its behalf and obtain and present any and all credit information, including, credit reports and financial statements and all other information of any kind received or reasonably required in connection with this Loan Application to its affiliated lender as necessary. |
| **REPORTING:** | Borrower will provide Lender with certified annual income statements and balance sheets on an annual basis (collectively, the "Financial Statements"). The statements will be prepared by Applicant, Applicant's CPA, or by an independent accounting firm acceptable to Lender. |
| **DISBURSEMENT OF PROCEEDS:** | Loan proceeds shall be disbursed upon closing and/or  based upon an approved draw schedule |
| **BORROWER WARRANTIES:** | In order to induce Lender to make the loan related to this Commitment Letter, Borrower makes the following Representations and Warranties which shall survive the execution of this Commitment Letter:<br>(a) Borrower duly exists and is in good standing under applicable state laws and Borrower through a named individual has been validly authorized by all necessary action to execute and deliver the loan documents<br>(b) All information and statements furnished by or on Borrower's behalf in connection with this Commitment and all other materials from time to time submitted to Lender are true, complete, and correct; |
| | (c) There is no litigation, pending or to the best of Borrower's knowledge threatened against Borrower, any Guarantor or the Property which may result in a material adverse change in the finances, business, operations, affairs or prospects of Borrower, any Guarantor or the use or value of the Property;<br>Neither Borrower, any Guarantor, nor any principal of Borrower is the subject of any pending criminal indictment or investigation, nor has been convicted of any felony; |

Borrower's Initials:

_____

| | |
|---|---|
| | (d) Borrower agrees to provide Lender promptly with supplemental information with respect to material changes affecting the property or guarantor group |
| | (e) The principals of the Borrower will not permit without the prior written permission of the Lender any material change in the ownership structure, control, or operation of the Borrower |
| | (f) At the time of closing, there shall be no outstanding suits, trusteeships, bankruptcies or court actions pending or threatened against the Borrower or the property to be mortgaged hereunder. In addition, Borrower's financial condition, in the sole judgment of Lender, shall not be materially impaired or changed between the date hereof and closing. |
| | (g) Borrower and its principals have no other outstanding debt, except those disclosed in underwriting. |
| **COVENANTS OF THE LOAN:** | The Loan Agreement shall contain the following covenants including but not limited to the following and shall obligate the Borrower to: |
| | (a) Maintain its form and existence; pay all its taxes; and maintain its property in good repair; |
| | (b) Maintain the insurance coverage set forth below, together with such additional coverage as the Lender may require in its sole discretion. All of the policies set forth below shall name Lender as Mortgage and Loss Payee in case of loss and shall contain such form and substance as shall be satisfactory to Lender. Such insurance shall be issued by the company or companies acceptable to Lender. Policy endorsement is also to include Notice of Cancellation to Lender at least ten (10) days prior to cancellation. At or before closing, Borrower shall deliver to Lender either a certificate evidencing such insurance or a duplicate original of the final policy; |
| |     (i)   Fire, hazard and extended coverage insurance in an amount satisfactory to Lender; |
| |     (ii)  Property liability insurance in amounts satisfactory to the Lender |
| |     (iii) Flood insurance if applicable; |
| |     (iv) Upon renewal of the policy or at such other time as Lender may request, Borrower shall furnish Lender a certificate or insurance or a duplicate original policy evidencing the required coverage. |
| | (c) Maintain proper business and accounting records in accordance with generally accepted principles; authorize Lender's access to the records. |
| | (d) Provide Lender with all closing conditions (ref Exhibit B) including annual certified financial statements (pursuant to reporting requirements stated above) including a profit and loss statement and balance sheet prepared by management.  Personal tax returns, business tax returns and annual financial statements shall be submitted within ninety (90) days of the close of the Borrower's fiscal year and shall be prepared by an independent certified public accountant on a review basis and in accordance with general accepted accounting principles; |
| | (e) Comply with applicable federal regulations regarding procurement, conflicts of interest, political activities, and hiring of personnel; federal, state, local laws, regulations, and ordinances; as well as with the terms of the other financing agreements entered into in conjunction with Lender's investment; |
| | (f) Use the funds for purposes represented to Lender in the loan request; |
| | (g) Notify Lender of any breach of the Loan Agreement; |
| | (h) Certify annually to Lender as to its compliance with the Loan Agreement; |
| | (i) Pay all legal, accounting, and other reasonable costs incurred by lender in collecting the loan, as well as any unusual servicing costs. |
| | (j) Comply with all terms of all other agreements to which Borrower is a party and notify Lender of any breaches of such other agreements. |
| **STANDARD REQUIREMENTS:** | Financial Reporting: The loan documents will contain language describing on-going financial data collection covenants that seek information quarterly and annually about the property operations the borrower and the guarantors. All information provided post-closing will be signed to be certified true and correct by the borrower. Similar to the data the borrower provides during the closing process, requests for annual state and federal tax returns will be full and complete copies including all supporting schedules and K-1s. |
| | Management: The property will be managed by an entity acceptable to lender either by a professional third-party management company or self-managed by an owner/operator of sufficient expertise and in either case, the management agreement will state maximum fees and the payment of those fees will be subordinate to the loan. |

Borrower's Initials:

_____

| | |
|---|---|
| | ACH Transfer: Throughout the Loan Term (s) Borrower agrees to make payments to Lender by automatic transfer and/or debit though the automated clearinghouse funds ("ACH") system. Borrower agrees to execute and deliver Lender's standard ACH form.<br><br>Expenses: Borrower agrees that they are responsible for all fees and expenses associated with the documenting, closing and monitoring of the Loan including but not limited to legal and collateral search/filing fees.<br>USA Patriot Act Compliance: Lender is required to be in compliance with Section 236 of the USA Patriot Act of 2001. As a result, borrower(s), principal(s), guarantor(s); all as individuals, (and spouses as may be appropriate), will be required to provide, as a condition to loan approval, all documentation requested during Lender's application and due diligence period. |
| **LOAN DOCUMENTS:** | To be on Lender's standard form loan documents and satisfactory to Lender in all respects. The Loan Documents will contain representations, warranties, covenants and events of default customarily found in credit agreements and related loan documents for similar financings and any additional representations, warranties, covenants and events of default deemed appropriate by the Lender (in its sole and absolute discretion) in the context of the proposed transaction. Financial and non-financial covenants including, but not limited to, such items as additional indebtedness (including an anti-layering covenant) affiliate transactions, asset sales, and payments or distributions to equity (subject to customary carve-outs) shall also be included in the Loan Documents. |
| **NO ADVERSE CHANGE:** | This commitment may be terminated by Lender any time prior to closing upon discovery, by Lender, of a material adverse change in or any misrepresentations or erroneous statements about the proposed project or in or about Borrower's position with respect to solvency, credit worthiness, ability to carry out the proposed project, government regulation, or another material factor. In the event of such termination, Lender is entitled to collect and retain all fees specified herein required of Borrower. Such termination shall become effective upon the mailing of notice of termination by Lender by certified mail to Borrower at the address shown on this commitment. This Commitment Letter is not to be construed as a commitment and in no way, obligates Lender to fund a mortgage loan to Borrower. Any commitment to provide financing will be subject to Lender's requirements and<br>approval of Lender's loan committee and shall be in writing, signed by Lender and Borrower. |

**LOAN REQUIREMENTS PRIOR TO CLOSING & FUNDING**

**This letter constitutes a loan commitment. The following are requirements prior to closing and funding:**

1.  Satisfactory final title update and legal opinion of Title;

2.  Within absence of unsatisfactory property conditions or other developments which may become evident until the date of closing;

3.  Operating Plan confirmation

Borrower's Initials:

_____

This commitment letter shall be construed in accordance with and governed by the laws of the state of South Carolina without giving effect to such state's choice of law rules. Please acknowledge acceptance of the terms of this Commitment Letter by signing and returning it, unaltered, in witness whereof, the below mentioned Parties have agreed to the terms of this Agreement and executed as of the Effective Date below.

**Agreed and Accepted:**
*Fairchild Opportunity Fund LLC*

*Mark Kelley*

By: Mark Kelley
Its: Senior Managing Partner
Date:

**Agreed and Accepted:**
*Uptown 240, LLC*

_____

By: Lenny Goldfarb
Its:
Date:

**Agreed and Accepted:**
*Uptown 240, LLC*

_____

By: Chantelle Ottoborgo
Its:
Date:

**Agreed and Accepted:**
*Fairchild Opportunity Fund LLC*

*Karen Kahn*

By: Karen Kahn
Its: Managing Partner
Date:

**Agreed and Accepted:**
*Uptown 240, LLC*

_____

By: Danilo Ottoborgo
Its:
Date:

- 5 -

Borrower's Initials:

_____

**Exhibit A – Property Specifications**

| Borrower | Property Address | APN | Type (Current/ Planned) | Year Built (Planned) | Lot Size/ Acreage | Building Size (Planned) | # of Buildings |
|---|---|---|---|---|---|---|---|
| Uptown 240, LLC, A Colorado Limited Liability Company | 240 Lake Dillon Drive Dillon,  Colorado 80435 | 2095-0740-48-001 2095-0740-54-001 | Residential For Sale Condominium/ Commercial (Retail) | 2025 | 51,078sf 1.17 acres | NRSF – 69,695 sf | 1/6 |

Borrower's Initials:

_____

Exhibit D



Fairchild Opportunity Fund, LLC
170 Meeting Street
Charleston, SC 29401
843.628.5080   t
866.563.3647   f
fairchildus.com   w

## Fairchild Conditional Commitment Letter

May 22, 2023

Danilo Ottoborgo
Uptown 240, LLC
240 Lake Dillon Drive
Dillon, Colorado 80435

Dear Mr. Ottoborgo:

The undersigned Borrower has been approved for construction financing under the following terms and conditions of the Uptown 240 project, an 80-unit residential for sale condo development/5,000sf commercial development located at 240 Lake Dillon Drive Dillon Colorado 80435.

**LOAN APPROVAL TERMS:**

| | |
|---|---|
| **LENDER:** | Fairchild Opportunity Fund, LLC an affiliate thereof, its successors, and/or assigns |
| **BORROWER(S)/ GUARANTOR(S)** | Established, approved, or to be formed special purpose entity for purposes of bridge financing for the subject property Uptown 240 LLC, A Colorado Limited Liability Company/ Danilo Ottoborgo, Chantelle Ottoborgo, Lenny Goldfarb and/or Fairchild internal credit enhancement |
| **PROPERTY ADDRESS:** | 240 Lake Dillon Drive Dillon Colorado 80435 - Please reference Exhibit A for associated property specifications |
| **ALLOCATION TYPE:** | Construction Financing |
| **STRATEGIC OBJECTIVE:** | Provide construction financing for the development of the subject property |
| **TYPE OF PROPERTY:** | Residential For Sale Condominium/Commercial (Retail) |
| **LOAN PROGRAM:** | Fairchild Construction Program |
| **LOAN AMOUNT:** | A loan in the amount of up to forty-nine million two-hundred thousand ($49,200,000) dollars |
| **USE OF PROCEEDS:** | Construction financing, closing costs, interest reserves, fees |
| **LTV:** | Sixty (65%) percent of completed value; as determined by an independent appraisal ordered by and acceptable to Fairchild and/or its affiliates |
| **TERM/MATURITY DATE:** | A total of three (3) years or thirty-six (36) months from the date of Closing + one (1) one (1) year extension options @ one (1%) percent cost |
| **INTEREST RATE:** | An interest rate of 1-Mo SOFR + nine hundred twenty five (925) bps |

- 1 -

Borrower's Initials:



| | |
|---|---|
| **AMORTIZATION SCHEDULE:** | Interest only |
| **GUARANTOR OBLIGATIONS:** | Recourse |
| **PREPAYMENT:** | Yield maintenance |
| **ASSUMPTION:** | N/A |
| **ESCROWS/RESERVES:** | Debt service reserve for construction period, operational shortfall reserve; Other Escrow. Lender will escrow for payment, on a monthly basis, one twelfth (1/12th) of the annual real estate taxes and one twelfth (1/12th) of the annual property and liability insurance premiums, plus an additional amount at closing sufficient to ensure that Lender will have sufficient funds in escrow, in advance, to make timely payment. |
| **ORIGINATION FEE:** | An origination fee based upon the below mentioned percentage of the final loan amount shall become due and payable by Borrower to the Lender and Fairchild at the time of issuance of the funding commitment and disbursed at time of closing.<br>Four (4.0%) percent of the final consolidated loan amount |
| **APPLICATION DEPOSIT:** | The financing costs shall include the following:<br><br>An Application Deposit.  An application deposit shall become due upon the execution of the CCL ("Application Deposit").<br><br>The total application deposit amount is estimated to be sufficient for the aforementioned purposes, but in the event actual out-of-pocket costs incurred by the Lender are in excess of this estimate, Borrower agrees to pay such excess amount, even if a Lender's Commitment is not issued and/or the Loan does not close. Provided the Deposit is sufficient for such expenses, Lender will pay for such expenses using the funds on deposit and will refund any excess to Borrower (verified against receipts). Borrower's acceptance of this CCL shall serve as its authorization for Lender to finalize all due diligence required prior to closing, as required.  Closing costs include: (i) Policy premiums for lender's Title Policy; (ii) Delivery of survey acceptable to Fairchild US and/or its affiliates; (iii) Lender and Advisor fees; (iv) Mortgage and documentary stamp taxes, recording fees, and similar expenses; (v) Legal Costs; and (ix) Other customary closing costs.  Borrower is also responsible for payment of its own legal fees and costs.  Any unused funds collected at the time of application shall be credited to the Borrower at time of closing.  In any unforeseen event that the proposed financing does not close within a 90-day period, the Good Faith Deposit shall be refunded. |
| **COLLATERAL:** | The Loan shall be evidenced by the promissory note of Borrower secured, inter alia, by:<br>(i) All acres of land including all improvements of subject property outlined in Exhibit A;<br>(ii) A first priority assignment of all future leases, rents, issues and profits;<br>(iii) A first priority and perfected security interest in all personal Property, licenses, permits, contract rights, general intangibles and other assets of Borrower used in connection with the operation, maintenance and management of the Property;<br>(iv) Assignments of equity interests in businesses related to the Property and UCC liens on all business assets;<br>(v) Such other collateral as may be specified in the Loan Documents. |
| **AUTHORIZATION:** | Borrower and/or the undersigned hereby authorize Lender to fully act on its behalf and obtain and present any and all credit information, including, credit reports and financial statements and all other information of any kind received or reasonably required in connection with this Loan Application to its affiliated lender as necessary. |
| **DISBURSEMENT OF PROCEEDS:** | Loan proceeds shall be disbursed upon closing and based upon an approved construction draw schedule |
| **REPORTING:** | Borrower will provide Lender with certified annual income statements and balance sheets on an annual basis (collectively, the "Financial Statements"). The statements will be prepared by Applicant, Applicant's CPA, or by an independent accounting firm acceptable to Lender. |
| **BORROWER WARRANTIES:** | In order to induce Lender to make the loan related to this Conditional Commitment Letter, Borrower makes the following Representations and Warranties which shall survive the execution of this Conditional Commitment Letter:<br>(a) Borrower duly exists and is in good standing under applicable state laws and Borrower through a named individual has been validly authorized by all necessary action to execute and deliver the loan documents |

Borrower's Initials:



|  | (b) All information and statements furnished by or on Borrower's behalf in connection with this Commitment and all other materials from time to time submitted to Lender are true, complete, and correct;<br>(c) There is no litigation, pending or to the best of Borrower's knowledge threatened against Borrower, any Guarantor or the Property which may result in a material adverse change in the finances, business, operations, affairs or prospects of Borrower, any Guarantor or the use or value of the Property;<br>Neither Borrower, any Guarantor, nor any principal of Borrower is the subject of any pending criminal indictment or investigation, nor has been convicted of any felony;<br>(d) Borrower agrees to provide Lender promptly with supplemental information with respect to material changes affecting the property or guarantor group<br>(e) The principals of the Borrower will not permit without the prior written permission of the Lender any material change in the ownership structure, control, or operation of the Borrower<br>(f) At the time of closing, there shall be no outstanding suits, trusteeships, bankruptcies or court actions pending or threatened against the Borrower of the property to be mortgaged hereunder. In addition, Borrower's financial condition, in the sole judgment of Lender, shall not be materially impaired or changed between the date hereof and closing.<br>(g) Borrower and its principals have no other outstanding debt, except those disclosed in underwriting. |
|---|---|
| **COVENANTS OF THE LOAN:** | The Loan Agreement shall contain the following covenants including but not limited to the following and shall obligate the Borrower to:<br>(a) Maintain its form and existence; pay all its taxes; and maintain its property in good repair;<br>(b) Maintain the insurance coverage set forth below, together with such additional coverage as the Lender may require in its sole discretion. All of the policies set forth below shall name Lender as Mortgage and Loss Payee in case of loss and shall contain such form and substance as shall be satisfactory to Lender. Such insurance shall be issued by the company or companies acceptable to Lender. Policy endorsement is also to include Notice of Cancellation to Lender at least ten (10) days prior to cancellation. At or before closing, Borrower shall deliver to Lender either a certificate evidencing such insurance or a duplicate original of the final policy;<br>    (i)  Fire, hazard and extended coverage insurance in an amount satisfactory to Lender;<br>    (ii)  Property liability insurance in amounts satisfactory to the Lender<br>    (iii)  Flood insurance if applicable;<br>    (iv)  Upon renewal of the policy or at such other time as Lender may request,<br>        Borrower shall furnish Lender a certificate or insurance or a duplicate<br>        original policy evidencing the required coverage.<br>(c) Maintain proper business and accounting records in accordance with generally accepted principles; authorize Lender's access to the records.<br>(d) Provide Lender with all closing conditions (ref Exhibit B) including annual certified financial statements (pursuant to reporting requirements stated above) including a profit and loss statement and balance sheet prepared by management.  Personal tax returns, business tax returns and annual financial statements shall be submitted within ninety (90) days of the close of the Borrower's fiscal year and shall be prepared by an independent certified public accountant on a review basis and in accordance with general accepted accounting principles;<br>(e) Comply with applicable federal regulations regarding procurement, conflicts of interest, political activities, and hiring of personnel; federal, state, local laws, regulations, and ordinances; as well as with the terms of the other financing agreements entered into in conjunction with Lender's investment;<br>(f) Use the funds for purposes represented to Lender in the loan request;<br>(g) Notify Lender of any breach of the Loan Agreement;<br>(h) Certify annually to Lender as to its compliance with the Loan Agreement;<br>(i) Pay all legal, accounting, and other reasonable costs incurred by lender in collecting the loan, as well as any unusual servicing costs.<br>(j) Comply with all terms of all other agreements to which Borrower is a party and notify Lender of any breaches of such other agreements. |
| **STANDARD REQUIREMENTS:** | Financial Reporting: The loan documents will contain language describing on-going financial data collection covenants that seek information quarterly and annually about the property operations the borrower and the guarantors. All information provided post-closing will be signed to be certified true and correct by the borrower. Similar to the data the borrower provides during the closing process, requests for annual state and federal tax returns will be full and complete copies including all supporting schedules and K-1s. |

- 3 -

Borrower's Initials:



| | |
|---|---|
| | Management: The property will be managed by an entity acceptable to lender either by a professional third-party management company or self-managed by an owner/operator of sufficient expertise and in either case, the management agreement will state maximum fees and the payment of those fees will be subordinate to the loan.<br><br>ACH Transfer: Throughout the Loan Term (s) Borrower agrees to make payments to Lender by automatic transfer and/or debit though the automated clearinghouse funds ("ACH") system. Borrower agrees to execute and deliver Lender's standard ACH form.<br><br>Expenses: Borrower agrees that they are responsible for all fees and expenses associated with the documenting, closing and monitoring of the Loan including but not limited to legal and collateral search/filing fees.<br><br>USA Patriot Act Compliance: Lender is required to be in compliance with Section 236 of the USA Patriot Act of 2001. As a result, borrower(s), principal(s), guarantor(s); all as individuals, (and spouses as may be appropriate), will be required to provide, as a condition to loan approval, all documentation requested during Lender's application and due diligence period. |
| **LOAN DOCUMENTS:** | To be on Lender's standard form loan documents and satisfactory to Lender in all respects. The Loan Documents will contain representations, warranties, covenants and events of default customarily found in credit agreements and related loan documents for similar financings and any additional representations, warranties, covenants and events of default deemed appropriate by the Lender (in its sole and absolute discretion) in the context of the proposed transaction. Financial and non-financial covenants including, but not limited to, such items as additional indebtedness (including an anti-layering covenant) affiliate transactions, asset sales, and payments or distributions to equity (subject to customary carve-outs) shall also be included in the Loan Documents. |
| **NO ADVERSE CHANGE:** | This conditional commitment may be terminated by Lender any time prior to closing upon discovery, by Lender, of a material adverse change in or any misrepresentations or erroneous statements about the proposed project or in or about Borrower's position with respect to solvency, credit worthiness, ability to carry out the proposed project, government regulation, or another material factor. In the event of such termination, Lender is entitled to collect and retain all fees specified herein required of Borrower. Such termination shall become effective upon the mailing of notice of termination by Lender by certified mail to Borrower at the address shown on this commitment. This Conditional Commitment Letter is not to be construed as a commitment and in no way, obligates Lender to fund a mortgage loan to Borrower. Any commitment to provide financing will be subject to Lender's requirements and approval of Lender's loan committee and shall be in writing, signed by Lender and Borrower. |

**LOAN REQUIREMENTS PRIOR TO CLOSING & FUNDING**

**This letter constitutes a conditional loan commitment.  The following are requirements prior to closing and funding:**

1. Receipt and satisfactory review of all closing conditions;

2. Satisfactory underwriting review of third-party reports to include appraisal, environmental, engineering, and P&C review;

3. Satisfactory final title update and legal opinion of Title;

4. Within absence of unsatisfactory property conditions which may become evident from the date of issuance of the mortgage loan commitment until closing;

5. Final Approval of the loan request by the credit committee of Lender;

6. All conditions of approval have been fulfilled and found to be satisfactory by Lender in its sole discretion.

- 4 -

Borrower's Initials:



Neither this conditional commitment letter nor the receipt by lender of the application deposit, or other amount shall constitute, or be construed to be, a binding commitment by Lender or an undertaking by lender to favorably consider the proposed loan or to issue any commitment. By signing below, Borrower acknowledges that (1) the above terms are not final or all-inclusive, (2) it has signed this conditional commitment letter and submitted the enclosed sums to lender solely for the purpose of inducing lender to conduct a further review of the above proposal and further such investigations as lender deems necessary for the purpose of determining whether the proposed loan meets its underwriting criteria. This conditional commitment letter shall be construed in accordance with and governed by the laws of the state of South Carolina without giving effect to such state's choice of law rules. Please acknowledge acceptance of the terms of this Conditional Commitment Letter by signing and returning it, unaltered, in witness whereof, the below mentioned Parties have agreed to the terms of this Agreement and executed as of the Effective Date below.

**Agreed and Accepted:**
*Fairchild Opportunity Fund LLC*

By: Mark Kelley
Its: Senior Managing Partner
Date: 05.19.23

**Agreed and Accepted:**
*Uptown 240 LLC*

By: Lenny Goldfarb
Its:
Date:

**Agreed and Accepted:**
*Uptown 240 LLC*

By: Chantelle Ottoborgo
Its:
Date:

**Agreed and Accepted:**
*Fairchild Opportunity Fund LLC*

By: Karen Kahn
Its: Managing Partner
Date: 05.19.23

**Agreed and Accepted:**
*Uptown 240 LLC*

By: Danilo Ottoborgo
Its:
Date:

- 5 -

Borrower's Initials:



**Exhibit A – Property Specifications**

| Borrower | Property Address | APN | Type (Current/ Planned) | Year Built (Planned) | Lot Size/ Acreage | Building Size (Planned) | # of Buildings |
|---|---|---|---|---|---|---|---|
| Uptown 240, LLC, A Colorado Limited Liability Company | 240 Lake Dillon Drive Dillon, Colorado 80435 | 2095-0740-48-001 2095-0740-54-001 | Residential For Sale Condominium/ Commercial (Retail) | 2025 | 51,078sf 1.17 acres | NRSF – 69,695 sf | 1/6 |

Borrower's Initials:



Exhibit E

**Owners Representative: Diversified Consulting Solutions, Inc.**

[http://www.dcs-cm.com](http://www.dcs-cm.com)

**About:**

DCS has been providing exceptional program management, project management and owner's representative consulting services since 1998.  Over the years, we've learned a lot about what works well and what doesn't.  We know the questions to ask that will stimulate thoughtful discussion regarding your vision, and we will serve as your trusted advisor to ensure you have clear, accurate and reliable information so you can make sound decisions and provide responsible leadership to the project.

Our experience in managing more than $400 million in constructed improvements makes us well-versed in every technical aspect and issue surrounding land and building development.  The DCS team has developed an affinity and expertise for working with large groups of diverse stakeholders and project participants with significant public and/or governmental accountabilities.

Although most projects bring with them a universal set of issues, challenges and expectations, we also recognize that every project has a unique set of dynamics, including individual personalities, critical success factors, and specialized technical requirements.  We continuously assess all facets of your project so we can respond quickly and effectively to any project issues – freeing you to focus on tasks other than the construction project at hand.

## John Sattler-PRESIDENT

John has a proven track record of building exceptional project teams and delivering the desired, predictable results clients demand. Early in his career he worked as a project manager for one of Colorado's largest school districts where he became skilled in working with large groups of users, stakeholders, community groups, governing agencies and the board. These situations required quick thinking, focus on the issues, and extreme awareness to arrive at consensus and achieve "winning" outcomes. In his more than 20 years of progressive project management experience John has routinely delivered successful projects that exceed traditional expectations for quality, budget, schedule and size.

## Valerie Thomson-Assistant Project Manager

Valerie provides more than nine years of experience in administrative support and client service. She adds value to the DCS team with her experience in managing client expectations and prioritizing tasks. Valerie approaches her work with a high level of energy, enthusiasm and attention to detail, which helps contribute to overall project success.

## Owner's Rep Services

Construction projects are a complicated web of coordination, and it takes years of experience to gain the insight needed to assure every detail is accounted for.  DCS provides comprehensive owner's rep services to navigate the development process on your behalf. We effectively work with all

stakeholders and Authorities Having Jurisdiction, and we deliberately manage the design and construction teams to achieve your scope on schedule and on budget. From concept through completion we will be your advocate and trusted advisor as we work together to build a successful project.

## Project Management Services

Strong project oversite helps assure that your project stays within scope and the schedule and budget are effectively managed.  DCS offers extensive experience overseeing construction and development operations on behalf of the owner.  While we endeavor to let each member of the project team do what they do well, we also remain very hands on and proactive to keep your project organized and on track.

We focus on providing unrivaled customer satisfaction through a controlled and deliberate approach.  Our organizational structure ensures your project will be managed by a principal of the firm, which provides to you a partner with real-time accountability and the authority to "make the call" regardless of the situation at hand.  We are agile, adaptable and responsive in ways that rival larger firms.

Exhibit F

Exhibit F
Liquidation Analysis

| **Asset** | **Estimated Value** | **Cost of Sale** | **Liens** | **Net Value** |
|---|---|---|---|---|
| Checking Account | $111,136.50 | $0.00 | $0.00 | $111,136.50 |
| Accounts Receivable [1] | $0.00 | $0 | $0 | $0.00 |
| Sale Contracts | $0.00 | $0 | $0 | $0.00 |
| Real Estate Development Project located | $27,000,000.00 | $1,620,000 | $16,820,443 | $8,559,557.22 |
| Litigation Claims | $0.00 | $0 | $0 | $0.00 |
| | | | | |
| **Total** | **$27,111,136.50** | **$1,620,000.00** | **$16,820,442.78** | **$8,670,693.72** |
| | | | | |
| **Administrative Expenses** | | | | |
| Chapter 7 Trustee Compensation | $836,584 | | | |
| Chapter 11 Attorney Fees [2] | $80,000 | | | |
| Committee Fees | $30,000 | | | |
| Chapter 11 Other Professional Fees | $30,000 | | | |
| Chapter 7 Professional Fees | $25,000 | | | |
| Priority Tax Claims | $0 | | | |
| **Total Administrative and Priority Claims** | **$1,001,584** | | | |
| | | | | |
| Total Amount Available for Unsecured Creditors | $7,669,109.63 | | | |
| Total Claims if all Claims Allowed, including Buyer Claims (estimate) | $11,400,000.00 | | | |
| Distribution to Class 8 if all Claims Allowed | 67.27% | | | |
| Total Claims if Claim of Air-Tel Disallowed (estimate) | $6,600,000.00 | | | |
| Distribution to Class 8 if Ait-Tel Disallowed | 100% | | | |
| [1] Receivables reduced to $0 because of conversion to Chapter 7 | | | | |
| [2] Assumes increased fees due to litigation over issues over conversion to a Chapter 7 | | | | |